734 P.2d 85

**Ramon GURULE and Maria Gurule, husband and wife, Plaintiffs/Appellees,**

v.

**ILLINOIS MUTUAL LIFE AND CASUALTY COMPANY, an Illinois corporation, Defendant/Appellant.**

**No. CV–86–0488–PR.**

Supreme Court of Arizona, En Banc.

March 2, 1987.

Reconsideration Denied April 15, 1987.

Langerman, Begam, Lewis and Marks, Phoenix, by Amy G. Langerman for plaintiffs/appellees.

Gust, Rosenfeld, Divelbess & Henderson, Phoenix, by Richard A. Segal, Brian Holohan, for defendant/appellant.

FELDMAN, Vice Chief Justice.

Plaintiff Ramon Gurule (Gurule) sued defendant Illinois Mutual Life and Casualty Company (Illinois Mutual) for breach of

contract and the tort of "bad faith." A jury awarded Gurule $25,506.54 in contract damages, $90,000 in compensatory tort damages, and $384,493.46 in punitive damages. Illinois Mutual appealed the bad faith claim, arguing that the evidence was insufficient to support the verdict. The court of appeals affirmed the jury's award of compensatory damages but vacated the punitive damages award. The court reasoned "that before punitive damages may be awarded in a bad faith case, the evidence must reflect *something more* than the reckless disregard necessary to support the [bad faith] claim." *Gurule v. Illinois Mutual Life and Casualty Co.*, No. 2 CA–CIV 5700, memo. op. at 3 (Ariz.Ct.App. May 9, 1986) (emphasis added).

We accepted review to clarify the kind and amount of evidence necessary to support punitive damages under *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565 (1986) and *Linthicum v. Nationwide Life Insurance Co.*, 150 Ariz. 326, 723 P.2d 675 (1986).[1] Rule 23(c)(4), Ariz.R.Civ.App.P., 17A A.R.S. (Supp.1986). We have jurisdiction under Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

## DISCUSSION

### A. *General Principles*

Punitive damages primarily further the same objectives underlying criminal law: punishing the defendant and deterring the defendant and others from future misconduct. *See Linthicum*, 150 Ariz. at 330, 723 P.2d at 679; W. PROSSER & W. KEETON, THE LAW OF TORTS § 2, at 9 (5th ed. 1984). Our decision in *Rawlings*—that punitive damages are appropriate only if defendant acted with an "evil mind"—was intended to limit punitive damage awards to situations in which they will further these objectives.

■ Punishment is an appropriate objective in a civil case only if the defendant's conduct or motive involves " 'some element of outrage similar to that usually found in crime.' " *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578 (quoting Restatement (Second) of Torts § 908 comment b (1979)). Punitive damages are therefore "undeserved as punishment" unless defendant acted with a knowing, culpable state of mind, or defendant's conduct was so egregious that the requisite mental state can be inferred. Cooter, *Economic Analysis of Punitive Damages*, 56 S.CAL.L.REV. 79, 79 (1982); *see also Rawlings*, 151 Ariz. at 162, 726 P.2d at 578 (citing A.R.S. § 13–105(5)(C)'s definition of "criminal recklessness" as appropriate measuring stick for punitive damages).

■ The same "evil mind" that justifies punitive damages as punishment also furthers the objective of deterring similar misconduct in the future. If defendant did not act with an "evil mind," however, compensatory damages usually provide the optimum level of deterrence. *See generally* Ellis, *Fairness and Efficiency in the Law of Punitive Damages*, 56 S.CAL.L.REV. 1, 23, 33 (1982). As Professor Cooter has explained, "for most potential injurers, it is far cheaper to comply with the law than risk liability, so noncompliance will usually be unintentional. If fault is unintentional, then imposing punitive damages in addition to compensatory damages is … unnecessary for deterrence…." 56 S.CAL.L. REV. at 79. It is only when fault is intentional[2] that the enhanced deterrence of punitive damages becomes necessary. *Id.* at 79–80. Thus, in bad faith cases, unless the evidence establishes that, in addition to bad faith, defendant acted with an evil mind, punitive damages are unnecessary because compensatory damages adequately deter. *See Rawlings*, 151 Ariz. at 159–163, 726 P.2d at 575–79; Note, *Damage Measurements for Bad Faith Breach of Contract: An Economic Analysis*, 39 STAN.L.REV. 161, 175–80 (1986).

If juries could award punitive damages without proof of anything more than bad faith, insurance companies may be overdet-

---

**1.** *Rawlings* was decided before *Linthicum,* but because of an error appears in a later volume of the Pacific Reporter.

**2.** Professor Cooter's definition of "intentional" is essentially the same as our definition of "evil mind." *See* 56 S.CAL.L.REV. at 79–80.

erred, and may pay legitimately questionable claims to avoid the risk of a punitive damages award. *See* Note, *supra,* 39 STAN.L.REV. at 179. Such a result would be bad policy as well as bad law. Insurance companies are not liable for punitive damages every time they commit a tort; something more is required. *Rawlings, supra.*

■ The requisite "something more," or "evil mind," is established by evidence that defendant either (1) "intended to injure the plaintiff ... [or (2)] consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Rawlings,* 151 Ariz. at 162, 726 P.2d at 578. This standard is satisfied by evidence that defendant's wrongful conduct was motivated by spite, actual malice, or intent to defraud. *Id.,* 151 Ariz. at 162–63, 726 P.2d at 578–79; W. PROSSER & W. KEETON, *supra* § 2, at 9–10 and nn. 23–32. Defendant's conscious and deliberate disregard of the interests and rights of others also will suffice. *Rawlings, supra;* W. PROSSER & W. KEETON, *supra* § 2, at 10.

■ Of course, the required evil mind may be established by defendant's express statements or inferred from defendant's expressions, conduct, or objectives. *Rawlings,* 151 Ariz at. 162–63, 726 P.2d at 578–79; *Linthicum,* 150 Ariz. at 331, 723 P.2d at 680. For example, defendant may have conducted himself in an outrageous or egregiously improper manner, thus permitting the inference that he intended to injure, or consciously disregarded the substantial risk that his conduct would cause significant harm.

■ Even if the defendant's conduct was not outrageous, a jury may infer evil mind if defendant deliberately continued his actions despite the inevitable or highly probable harm that would follow. *See, e.g., Delgado v. Heritage Life Insurance Co.,* 157 Cal.App.3d 262, 278, 203 Cal.Rptr. 672, 681–82 (Cal.Ct.App.1984) (restrictive policy interpretation coupled with repeated failure to investigate sufficient to infer conscious disregard); *Little v. Stuyvesant Life Insurance Co.,* 67 Cal.App.3d 451, 462, 136 Cal.Rptr. 653, 659 (Cal.Ct.App.1977) (termination of disability benefits despite overwhelming medical evidence of disability); *Grimshaw v. Ford Motor Co.,* 119 Cal. App.3d 757, 813, 174 Cal.Rptr. 348, 384 (Cal.Ct.App.1981) (punitive damages appropriate when Ford "knew that the Pinto's fuel tank and rear structure would expose consumers to serious injury or death"). A jury certainly may infer evil mind when a defendant continues a course of conduct with knowledge of the past harm caused by that conduct. *Grimshaw, supra.* No doubt other circumstances, alone or in combination, may justify the inference of an evil mind. *See, e.g., Hawkins v. Allstate Insurance Co.,* 152 Ariz. 490, 733 P.2d 1073 (1987) (pattern of dishonest or fraudulent conduct); Restatement (Second) of Torts § 908 comment c (1979) (punitive damages appropriate "when a tort ... is committed for an outrageous purpose" even though no significant harm results).

In summary, the propriety of awarding punitive damages turns upon the defendant's state of mind. Intent to injure or defraud, or pursuit of wrongful conduct with conscious disregard of the probability of some injury or damage to the rights and interests of others all qualify as forms of "evil mind," justifying imposition of punitive damages. We abandon such terms as "gross," "reckless," and "wanton" conduct. They convey little, and fail to focus the jury's attention on the important question—the defendant's motives. The quality of defendant's conduct is relevant and important only because it provides one form of evidence from which defendant's motives may be inferred. The more outrageous or egregious the conduct, the more compelling will be the inference of "evil mind." Of course, defendant's state of mind may be evidenced by other factors and may be established or inferred even if defendant's conduct was outwardly unexceptional. The inquiry in every punitive damage case focuses on the defendant's state of mind, which may be established by either direct or circumstantial evidence.

### B. *Issues and Facts*

In the present case, the legal standard articulated in *Rawlings* and *Linthicum*

was not conveyed to the jury. The trial judge instructed the jury that it could award punitive damages if it found, by a preponderance of the evidence, that defendant "engaged in wilful or wanton conduct ... which shows reckless indifference to the results of an act or reckless indifference to the rights and welfare of others." The standard articulated in *Rawlings* requires more than "reckless indifference." *Filasky v. Preferred Risk Mutual Insurance Co.*, 152 Ariz. 591, 599 n. 3, 734 P.2d 76, 84 n. 3 (1987); *Linthicum*, 150 Ariz. at 331, 723 P.2d at 680.[3]

Although the trial court's punitive damages instruction was incorrect, Illinois Mutual did not appeal the instruction; it appealed only the sufficiency of the evidence. Therefore, we must review the facts in the light most favorable to Gurule and affirm the jury's verdict if a reasonable juror could conclude that Illinois Mutual either intended to violate Gurule's rights under the policy or consciously pursued a course of conduct knowing that it created a substantial risk of doing so. With these principles in mind, we turn to the facts.

Gurule purchased "paycheck replacement" individual disability insurance from Illinois Mutual in 1974. The policy provided disability benefits for a maximum of five years. During the first two years following injury, one is "totally disabled" if "completely unable to perform each and every duty pertaining to his occupation." Illinois Mutual interprets this definition to mean that an insured is totally disabled if he is unable to perform the "substantial and material" duties of his job.

On February 18, 1981, Gurule, until then a self-employed carpet installer earning $1,400 per month, filed a total disability claim with Illinois Mutual. Stating that he had injured his back and teeth in a January 10, 1981 automobile accident, Gurule claimed benefits beginning on the Monday following the accident.

Gurule sought treatment for his injuries from two doctors: Dr. Ross, his dentist, and Dr. Carlson, a family practitioner. Gurule saw Dr. Ross on January 29. He did not seek earlier treatment because he had been sick with the flu. Gurule was first treated by Dr. Carlson on February 17. Dr. Carlson reported that Gurule had a cervical and dorsal sprain and had been continuously disabled since the day of the accident. Dr. Carlson and Gurule reaffirmed Gurule's disability status in April 1981. On April 8, Gurule further injured his back in a second car accident. Illinois Mutual made its first disability payment on April 29, almost one month late under the terms of the policy.

In May 1981, Illinois Mutual hired Equifax, an insurance investigation company, to investigate Gurule's claim and to help schedule an independent medical examination. Equifax reported that one of Gurule's neighbors "was very emphatic" that Gurule could not install carpet, but felt that Gurule might be able to supervise work at his carpet warehouse. Equifax did not talk with Gurule. Also in May, Illinois Mutual wrote Dr. Carlson, asking for answers to a series of questions about the "symptoms causing [Gurule's] disability." Illinois Mutual's letter did not define disability or specifically ask for objective evidence of disability. Dr. Carlson's response stated that Gurule was totally disabled, that his condition had been worsened by the second accident, and that Gurule now had symptoms of ulnar root compromise. Gurule filed a continuance of disability report in May, indicating that his injury was aggravated by the second accident and that he had not returned to work. Illinois Mutual paid additional monthly benefits on May 28.

---

**3.** *Linthicum* also held that punitive damages must be proved by "clear and convincing" evidence. 150 Ariz. at 332, 723 P.2d at 681. However, because we recently held that *Linthicum's* clear and convincing evidence standard will not be applied retroactively, *Hawkins*, 152 Ariz. at 503–505, 733 P.2d at 1086–1088, it was not error for the trial court to instruct the jury on preponderance of the evidence. At any rate, the distinction between preponderance of the evidence and clear and convincing evidence is unimportant here because we find the evidence insufficient to meet even the preponderance threshold. *See Linthicum*, 150 Ariz. at 332, 723 P.2d at 681 (evidence insufficient under either standard).

During June 1981, Illinois Mutual scheduled an independent medical examination for July 20, 1981 with Dr. John Soscia, an orthopedic specialist. Illinois Mutual told Dr. Soscia that an examination was warranted because of "a lack of clinical evidence affirming a possible total disability status...." Pursuant to corporate policy, Illinois Mutual informed Dr. Soscia that "[o]ur policy does not provide benefits unless the insured is unable to perform substantially all the duties of his occupation." Illinois Mutual never informed Dr. Carlson of its definition of total disability, nor did it ask Dr. Carlson for objective "clinical" evidence of disability. Dr. Soscia was not provided with a list of Gurule's job duties, although Illinois Mutual had provided such lists to other doctors who performed independent medical examinations of other claimants.

In July 1981, Illinois Mutual received additional reports verifying total and continuous disability from Dr. Carlson and Gurule. Illinois Mutual also received Dr. Wayne Broky's report of an electromyogram (EMG) requested by Dr. Carlson. Dr. Broky stated that Gurule's EMG was normal. He also noted: "Injury was two months ago. Symptoms are certainly characteristic of right C–8 nerve root irritation. A repeat test may be of value for comparison in several weeks if symptoms persist or worsen." On July 14, an Illinois Mutual claims adjuster reviewed the entire Gurule claim for her supervisor. Her memorandum concluded: "We have recently set up an examination to be performed on July 20th. When I receive the results of this examination, I will immediately refer it to you to discuss with the doctor. There is not much we can do on this claim until we receive the IME [independent medical examination]...." [4]

Illinois Mutual received Dr. Soscia's report on July 31, 1981. Dr. Soscia's opinion was that Gurule had "a lack of objective physical findings. At this time I feel the patient should be able to return to his normal occupation without any difficulty. He has no permanent impairment." Dr. Soscia testified at trial that although he considers subjective evidence when evaluating his own patients, he looks only for objective physical evidence of disability when he performs examinations for insurance companies. However, there was no evidence that this dual standard was requested or expected by Illinois Mutual.

After its medical director reviewed Gurule's file, Illinois Mutual terminated Gurule's disability benefits because Dr. Soscia's examination revealed no objective evidence of disability. Dr. Carlson testified at trial that he had supplied Illinois Mutual with some objective evidence, and that he had other objective evidence, x-rays and muscle spasms, to support his total disability diagnosis.

Gurule accepted Dr. Soscia's suggestion and returned to work for one day in November 1981. According to a letter from Dr. Carlson to Illinois Mutual, after one day of work Gurule appeared in his "office in extreme distress and pain in both his lumbar spine and in his cervical spine, with symptoms radiating into his right arm...." Dr. Carlson advised Illinois Mutual that he had instructed Gurule not to return to work and that he "disagree[d] with both Dr. Soscia's findings and conclusions...." Dr. Carlson also advised Illinois Mutual that he had arranged for an additional independent orthopedic consultation.

Gurule's attorneys urged Illinois Mutual to reinstate benefits. Instead, Illinois Mutual arranged for another independent medical examination with Dr. Bertram Feingold. Reporting that Gurule was somewhat uncooperative during his examination and suggesting another EMG, Dr. Feingold concluded:

> I would anticipate that, if the EMG were normal, the patient should be capable of

---

**4.** Dr. Thomas Morehart, an insurance expert retained by Gurule, testified at trial that in his opinion this memorandum demonstrated Illinois Mutual's decision to obtain an independent medical examination as a basis for denying Gurule's claim. Dr. Morehart's testimony presumably referred to the subjective intentions of Illinois Mutual's claims personnel. The admissibility of expert testimony as to credibility and subconscious motivation is dubious. *Cf. State v. Moran,* 151 Ariz. 378, 728 P.2d 248 (1986). We give little weight to such speculation.

returning, on a graduating basis, to his former work as a carpet installer, and gradually work back into a full eight-hour day and full lifting activities over the next 45 to 60 days. Also, if the EMG were normal, then I would not anticipate there being any objective evidence of permanent impairment as a result of either of the two accidents in question.

At this time, however, the patient is capable of a wide variety of light-duty activities which would allow him intermittent standing and sitting, without prolonged walking beyond five to ten minutes.

On December 30, 1981, Gurule's attorneys sent to Illinois Mutual office notes from Dr. William Hunter, an orthopedic specialist who had examined Gurule at Dr. Carlson's request. Dr. Hunter had suggested that Gurule be hospitalized for physical therapy.

At this point, William Fitzgerald, Illinois Mutual's general counsel, assumed responsibility for Gurule's claim. Mr. Fitzgerald sent Gurule's attorneys a copy of Dr. Feingold's report and explained, "As you can see, Dr. Feingold is of the opinion that Mr. Gurule is probably not totally disabled...." Mr. Fitzgerald had not referred Dr. Feingold's report to Dr. Gorsuch, Illinois Mutual's medical director. Dr. Gorsuch testified by deposition that based on Dr. Feingold's report, he would have concluded that Gurule was incapable of performing his occupation as of December 21.

On January 22, 1982, Gurule's attorneys threatened to sue if benefits were not reinstated. Mr. Fitzgerald agreed to reinstate benefits as a "show of good faith and because of the variance of medical opinions." At trial, Mr. Fitzgerald denied that he reinstated benefits because of objective evidence of disability. He testified that he agreed to reinstate benefits because of the variance of medical opinions and the delay in obtaining the additional EMG suggested by Dr. Feingold.

Illinois Mutual obtained results of the EMG suggested by Dr. Feingold on March 22, 1982. The EMG was "normal," showing no evidence of permanent injury. Dr. Gorsuch reviewed the EMG results and Dr. Feingold's earlier report and concluded that Gurule could probably return to work on a graduated basis without exacerbating his condition. Dr. Feingold also reexamined Gurule. He concluded that there was no objective evidence of any permanent impairment and that there was no reason why Gurule could not return to his former work. Dr. Feingold also noted, however, that there was some evidence of degenerative disc disease of the cervical spine, and that heavy work such as carpet installation could aggravate this condition. Dr. Feingold therefore advised Gurule to consider some lighter form of work.

Illinois Mutual continued to pay benefits through April 1982. On May 3, 1982, in a letter to Gurule's attorneys, Illinois Mutual again terminated benefits after considering five factors: Dr. Soscia's initial report, Dr. Feingold's two reports, the most recent EMG, and Dr. Carlson's continuing certification of total disability. At trial, Mr. Fitzgerald testified that the decision to terminate benefits was based on a review of all the evidence. In its May 3 letter, Illinois Mutual offered to pay benefits for one additional month, so that Gurule gradually could resume working.

This lawsuit was filed on July 14, 1982. In August, Illinois Mutual contracted with Protech for in-depth surveillance of Gurule. Mr. Fitzgerald testified in his deposition that after this surveillance was concluded, Illinois Mutual believed it was appropriate to pay benefits through January 1983 for the first 24 months of Gurule's disability. Disability benefits were not, however, paid for this full period. Mr. Fitzgerald explained at trial that benefits were not paid because the company did not receive any additional continuance of disability reports from Gurule or Dr. Carlson. The record does not indicate whether such reports were requested.

After two years of disability, the definition of disability in Gurule's policy changes from the insured being unable to perform "his occupation," to the insured being unable to "engage in any occupation or em-

ployment for wage or profit in which he might reasonably be expected to engage with due regard to his education, training, experience and previous standard of living." Based on information in its claims file and information obtained from Gurule's deposition, Illinois Mutual concluded on January 27, 1983 that Gurule was not disabled under the "any occupation" definition. Illinois Mutual believed Gurule was capable of supervising carpet installation, selling carpet, estimating floor covering costs for commercial bids, or working as a mailman or a mechanic. Illinois Mutual did not research Gurule's potential for actual employment in any of these positions. In fact, although Gurule tried several jobs, he was unable to replace the income he was making before he was injured.

### C. *Sufficiency of the Evidence*

The jury found and the court of appeals agreed that Illinois Mutual breached its implied covenant of good faith and fair dealing by denying, without a reasonable basis, Gurule's claim. *See Rawlings,* 151 Ariz. at 156, 726 P.2d at 572. Thus, it has been established that Illinois Mutual's conduct was wrongful and that extracontractual damages were warranted. The only question before us is whether, in addition to breaching its covenant of good faith and fair dealing, there is sufficient evidence from which a jury could infer that Illinois Mutual acted with an "evil mind."

Relying primarily on *Little v. Stuyvesant Life Insurance Co.,* 67 Cal.App.3d 451, 136 Cal.Rptr. 653, Gurule argues that the evidence in this case is sufficient to infer the required evil mind. We disagree. Despite superficial similarities, *Little* actually illustrates why punitive damages are inappropriate in this case.

In *Little,* as here, the insurer terminated disability benefits on the basis of two independent medical examinations. Unlike this case, however, Little's claim was supported

by "overwhelming" objective medical evidence of disability. 67 Cal.App.3d at 457, 136 Cal.Rptr. at 656. Prior to the onset of her disability, Little had two lumbar fusions and two myelograms, was only able to work in a brace, and was on pain medication. Little's final disability was attributed to nerve root irritation. After the claimed onset of disability, Little had four major surgical procedures, including three cervical anterior body fusions and a surgery to relieve nerve root pressure caused by scar tissue. The life insurer for the program waived premiums because of disability; Little also was found totally disabled by both the state and the Social Security Administration. She took daily medication for pain and was unable to perform even such simple tasks as grocery shopping. She was unable to sit or stand, hold a book, or perform any sustained activity. She spent hours each day in a jacuzzi to relieve her pain.

Defendant had full knowledge of Little's condition, and of the medical evidence supporting her disability claim. Defendant nevertheless insisted on two independent medical examinations; it provided neither of the doctors performing these examinations with the voluminous information in its files from Little's doctors.[5] The second examining doctor determined that Little was not disabled because she could "perform 'a half day's work as a receptionist'" and had the ability to "'open . . . a drawer and put a file in and close it.'" 67 Cal. App.3d at 459, 136 Cal.Rptr. at 657. In addition, defendant was aware that Little had lost her home, had borrowed money, and had attempted suicide as a result of her disability. Still, defendant refused to reinstate benefits. 67 Cal.App.3d at 457–61, 136 Cal.Rptr. at 656–58.[6]

The difference in medical evidence between *Little* and this case is critical. In *Little,* the denial of benefits was "outrageous" and punitive damages were ap-

---

**5.** Illinois Mutual similarly failed to provide Dr. Soscia with Dr. Carlson's records. However, it supplied Dr. Feingold with Gurule's records.

**6.** Little alleged intentional infliction of emotional distress, not bad faith. The jury awarded

$2,500,000 in punitive damages. The court of appeals reduced the punitive damages award to $250,000, which is substantially less than the nearly $385,000 awarded to Gurule.

propriate because the jury reasonably could infer the requisite intent to harm from the insurer's denial of benefits in the face of "overwhelming" medical evidence. 67 Cal.App.3d at 462, 136 Cal.Rptr. at 659. Here, on the other hand, Illinois Mutual did not ignore "overwhelming" medical evidence when it denied Gurule's claim. Gurule's disability resulted from accidental injuries for which he did not immediately seek medical treatment. He first sought a dental examination nineteen days after the accident, and did not consult a physician until 38 days after the accident. Dr. Carlson diagnosed a soft tissue injury; although Gurule displayed some signs of nerve root irritation, very little objective evidence of disability was ever conveyed to Illinois Mutual. Gurule's EMG's were all normal, including those performed by his doctor. Even Dr. Carlson stated at several points that Gurule probably would be able to return to work within a few months.

As it turned out, Drs. Carlson, Soscia, and Feingold were too optimistic. Nevertheless, there is no "overwhelming" medical evidence to support the conclusion that Illinois Mutual knew Gurule was disabled and denied benefits with conscious indifference to Gurule's rights and the significant harm caused by its conduct. There is no evidence to justify an inference that Illinois Mutual arranged for "independent" medical examinations with disreputable doctors, tried to influence the doctors' opinions, or purposefully withheld information from them. In this case, unlike *Little*, the facts regarding the nature of the accident, the ensuing medical treatment, and the handling of Gurule's file are insufficient to infer that Illinois Mutual consciously disregarded its obligations to Gurule.

 The facts strongly suggest, on the other hand, that Illinois Mutual tried to play fairly with Gurule. Here, unlike *Lit-*

*tle*, the insurer applied a reasonable definition of disability, reinstated the claim when pressed to do so, and, at times, resolved conflicting medical opinions in favor of its insured. Illinois Mutual apparently was willing to continue paying disability benefits until the more strict policy definition of disability applied. In addition, Illinois Mutual paid Gurule benefits even when substantial evidence suggested that Gurule was not disabled. Its decisions to terminate benefits were based on apparently reputable medical evidence that arguably supported its position, and it explained its actions to Gurule, giving him a reasonable opportunity to respond. It responded, albeit grudgingly, to Gurule's requests for reconsideration. In sum, although the jury found that Illinois Mutual had insufficient grounds to deny Gurule benefits, we do not believe the evidence is sufficient to allow a reasonable juror to infer that Illinois Mutual acted with an intent to injure, or in conscious disregard of Gurule's rights under his policy. *Compare Filasky, supra; Linthicum, supra; Farr v. Transamerica Occidental Life Insurance Co.*, 145 Ariz. 1, 699 P.2d 376 (App.1984); *Maxwell v. Aetna Life Insurance Co.*, 143 Ariz. 205, 693 P.2d 348 (App.1984).[7] Illinois Mutual did, no doubt, consider its own interests in denying Gurule's claim. Self interest is not, however, evidence of an "evil mind."

## CONCLUSION

The jury found that Illinois Mutual failed to perform its contract with Gurule in good faith. Consequently, Illinois Mutual has been required to pay over $115,000 in contract and tort damages. These damages include the disability payments required by the contract, plus extracontractual compensation for mental distress, inconvenience, and other losses. Illinois Mutual also has

---

7. Gurule argues that insurers should be especially careful in denying disability claims because the insured is presumably " 'disabled and in strait financial circumstances and, therefore, particularly vulnerable to oppressive tactics on the part of an economically powerful entity.' " *Delgado*, 157 Cal.App.3d at 277, 203 Cal.Rptr. at 681 (quoting *Fletcher v. Western National Life Insurance Co.*, 10 Cal.App.3d 376, 404, 89 Cal. Rptr. 78, 95 (Cal.Ct.App.1970)). Even if some special protection is warranted, however, not every mistaken denial of disability benefits justifies punitive damages. "[T]he insured must still establish that the insurer acted with the requisite ... intent...." *Delgado*, 157 Cal.App.3d at 277, 203 Cal.Rptr. at 681; *see also Rawlings*, 151 Ariz. at 162, 726 P.2d at 578.

been required to pay Gurule's attorneys' fees. These awards fully compensate Gurule. The punishment and deterrence provided by punitive damages are inappropriate and unnecessary because there is insufficient evidence for a jury to infer that Illinois Mutual either intended to injure Gurule or acted in conscious disregard of Gurule's interests, knowing that it had insufficient grounds to withhold benefits. The evidence did not justify submittal of the punitive damage issue. The court of appeals' decision is approved as modified. The judgment is affirmed in part and reversed in part.

GORDON, C.J., and CAMERON, J., concur.

HOLOHAN, J., recused himself and did not participate in the determination of this action.

HAYS, J., participated in the determination of this matter but resigned before the opinion was filed.