IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

SCOT and JOANNA SOBIESKI,
husband and wife, *Plaintiffs/Appellees,*

*v.*

AMERICAN STANDARD INSURANCE
COMPANY OF WISCONSIN, a
Wisconsin corporation; AMERICAN FAMILY
MUTUAL INSURANCE COMPANY, a
Wisconsin company authorized to do business in Arizona,
*Defendants/Appellants.*

No. 1 CA-CV 14-0416
FILED 9-29-2016

Appeal from the Superior Court in Maricopa County
No. CV2010-092624
The Honorable David King Udall, Judge

**AFFIRMED IN PART; REVERSED IN PART;
VACATED AND REMANDED IN PART**

COUNSEL

Law Office of Richard A. Dillenburg, PC, Tempe
By Richard A. Dillenburg
*Co-Counsel for Plaintiffs/Appellees*

Knapp & Roberts, PC, Scottsdale
By David L. Abney
*Co-Counsel for Plaintiffs/Appellees*

Tyson & Mendes, LLP, Phoenix
By Lynn M. Allen
*Co-Counsel for Defendants/Appellants*

Lewis Roca Rothgerber Christie, LLP, Phoenix
By Steven J. Hulsman, Jon D. Weiss, Jared L. Sutton
*Co-Counsel for Defendants/Appellants*

---

**OPINION**

Presiding Judge Diane M. Johnsen delivered the opinion of the Court, in which Judge Patricia A. Orozco and Judge Kenton D. Jones joined.

---

**J O H N S E N**, Judge:

**¶1**         A motorcyclist was badly injured when he slammed into a car that had stopped abruptly in front of him. Although the driver of the car was uninsured, the motorcyclist had uninsured motorist coverage. The motorcyclist's insurer denied the claim, however, because it concluded the motorcyclist was solely at fault in the accident. We affirm a judgment against the insurer for breach of the duty of good faith and fair dealing, but, in the absence of evidence linking its denial of coverage to an improper motive, we vacate the award of punitive damages.

**FACTS AND PROCEDURAL BACKGROUND**

**¶2**         Scot Sobieski and three others on motorcycles were riding along a North Phoenix thoroughfare one afternoon. The driver of a car they were following slowed to make a right turn, then abruptly stopped. Sobieski tried to swerve around the car, but he hit its left rear, severely injuring his leg. The following day, February 19, 2007, Sobieski's wife, Joanna, reported the accident to their insurer, American Standard Insurance Company of Wisconsin. Although the driver of the car was uninsured, the Sobieskis had purchased $100,000 of uninsured motorist coverage, which would be implicated if and to the extent the driver was at fault in the collision.

**¶3**         At American Standard, adjuster Caroline Biddlecome was assigned to the claim. Biddlecome reviewed the notice of loss, which documented Joanna Sobieski's initial call to the insurer and stated police had cited her husband for failure to control his speed and following too

2

closely. Biddlecome then telephoned the motorist, who told Biddlecome that she had stopped before turning right even though the traffic light was green because a pedestrian had walked out in front of her. The motorist said she felt a bump and saw Sobieski "fly by" her on the driver's side. She told Biddlecome her boyfriend was in the car with her at the time of the collision. Biddlecome did not record the motorist's statement, nor did she ask for any details about the pedestrian, or whether the motorist was using her turn signal or her rearview mirrors. Nor did Biddlecome try to interview the boyfriend.

¶4        The police report of the accident did not arrive at American Standard for several days. In the meantime, Biddlecome completed a liability analysis worksheet attributing 100 percent fault for the accident to Sobieski. Biddlecome then spoke again with Joanna Sobieski, who told her one of the other three motorcyclists said the car had stopped suddenly and that Sobieski had tried going around it on the right side (not the left), but lost control, hitting the rear of the vehicle. According to Biddlecome's notes of their phone conversation, nothing Joanna Sobieski said changed her preliminary evaluation that Scot Sobieski was 100 percent at fault. Biddlecome told Joanna Sobieski there was no coverage for the claim because "anyone can stop in front of you for any reason. You have to maintain safe distance to react to them. [Sobieski] did not do that and is considered the cause of the accident." The police report that eventually arrived at American Standard identified the other three motorcyclists and named the passenger in the car, but Biddlecome did not speak with any of them. A month later, Biddlecome telephoned Scot Sobieski, who told her he was unable to recall anything about the accident. Biddlecome reiterated that the policy would not cover his medical expenses because he was at fault in the accident. Biddlecome closed the file on the claim shortly thereafter.

¶5        More than a year later, a lawyer for the Sobieskis submitted a policy-limit demand to American Standard. The lawyer recounted Sobieski's several injuries, including "open right tibia and fibula fractures with severe comminution, tibial topical avulsion," along with a right rotator cuff tear and fractured clavicle. He said Sobieski still was not released to return to work and was unable to walk without crutches. The lawyer enclosed medical bills totaling $115,667 and argued that written statements from the three other motorcyclists suggested the driver of the car should share some fault in the accident. The motorcyclists' statements were enclosed; two of them cast doubt on the motorist's assertion that there was a pedestrian in the intersection and asserted she had not used her turn

signal. One of the motorcyclists also opined that the collision was caused by the motorist's "erratic driving" and failure to signal.

¶6　　　　Upon receipt of the letter, American Standard re-opened the claim and assigned it to adjuster Verna Holmes. Holmes, however, did not contact the driver of the car and did not interview any of the witnesses the Sobieskis had identified. In her file notes, Holmes mistakenly reported that Sobieski had been traveling 15 miles over the speed limit, when the police report had stated he had been traveling 15 miles under the speed limit. Based on Biddlecome's original investigation, and with the approval of her supervisor, Philip Nick, Holmes again denied the Sobieskis' claim. As Nick explained in file notes, "the fault for this accident is unfortunately with our insured. We can not [sic] pay for the injuries he caused himself."

¶7　　　　The Sobieskis then sued American Standard for breach of contract. The arbitrator who heard the claim found the Sobieskis' damages totaled $950,000 and ruled that Sobieski was 60 percent at fault in the accident and the motorist, 40 percent. After American Standard paid the policy limit of $100,000, the Sobieskis sued again, alleging breach of the duty of good faith and fair dealing. A jury found in favor of the Sobieskis and awarded $500,000 in compensatory damages and $1,000,000 in punitive damages. The superior court denied American Standard's motions for judgment as a matter of law and for new trial. We have jurisdiction of American Standard's timely appeal pursuant to Arizona Revised Statutes ("A.R.S.") sections 12-2101(A)(1), (A)(5)(a) (2016) and 12-120.21(A)(1) (2016).[1]

## DISCUSSION

### A.　　Standard of Review.

¶8　　　　The superior court may grant a motion for judgment as a matter of law "if there is no legally sufficient evidentiary basis for a reasonable jury to find for" the non-moving party. Ariz. R. Civ. P. 50(a); *see Shoen v. Shoen*, 191 Ariz. 64, 65 (App. 1997) ("if the facts presented in support of a claim have so little probative value that reasonable people could not find for the claimant"). We review the superior court's ruling on a motion for judgment as a matter of law *de novo*, viewing the evidence and all reasonable inferences from it in the light most favorable to the nonmoving

---

[1]　　　Absent material revision after the relevant date, we cite a statute's current version.

party. *See County of La Paz v. Yakima Compost Co.*, 224 Ariz. 590, 596, ¶ 5 (App. 2010).

**¶9** The superior court may grant a motion for new trial if the jury's verdict is against the weight of the evidence. *Goodman v. Physical Res. Eng'g, Inc.*, 229 Ariz. 25, 28, ¶ 6 (App. 2011). We review the superior court's denial of a motion for a new trial for an abuse of discretion. *Id.*

## B.     Breach of the Duty of Good Faith and Fair Dealing.

**¶10** In every insurance contract, there is an implied legal duty obligating the insurer to act in good faith; breach of that duty may give rise to a claim for the tort of bad faith. *Noble v. Nat'l Am. Life Ins.*, 128 Ariz. 188, 190 (1981). The implied covenant of good faith and fair dealing forbids an insurer from taking any action that would undermine its insured's realization of the expected contractual benefits, which, in this context, are "protection and security from economic catastrophe." *Rawlings v. Apodaca*, 151 Ariz. 149, 154 (1986). "Conduct by the insurer which does destroy the security or impair the protection purchased breaches the implied covenant of good faith and fair dealing implied in the contract." *Id.* at 155.

**¶11** To establish a claim for bad faith, an insured must prove the insurer acted unreasonably and either knew its conduct was unreasonable or acted with such reckless disregard that knowledge of unreasonableness may be imputed to it. *See Deese v. State Farm Mut. Auto. Ins.*, 172 Ariz. 504, 507 (1992). Mere negligence is not enough. *Id.* Here, the Sobieskis alleged American Standard breached its duty of good faith by unreasonably investigating and denying their claim for coverage.

**¶12** The Sobieskis presented sufficient evidence from which the jury could conclude that American Standard's investigation of the claim was not reasonable. Biddlecome knew that, in addition to Scot Sobieski, there were five witnesses to the accident - the driver of the car, the driver's passenger, and the three other motorcyclists who trailed Sobieski to the intersection. Biddlecome, however, spoke only to the motorist and Sobieski and never tried to contact any of the four others. She reached a conclusion about liability without having reviewed the police report. And after reopening the claim at the request of the Sobieskis' lawyer, the second adjuster, Holmes, did nothing more to investigate the accident.

**¶13** Arizona's comparative negligence regime figured prominently in the Sobieskis' coverage claim. Under Arizona law, a party who is only partially at fault in an accident may be liable for a proportionate share of the claimant's damages. *See* A.R.S. § 12-2506 (2016). When

damages are great, even a small share of the liability can have significant financial consequences. As the Sobieskis argue, American Standard knew early in the claims process that damages for Sobieski's injuries likely would well exceed the $100,000 limits of his uninsured motorist coverage. That being the case, if the motorist was at fault even to a small degree, the Sobieskis' uninsured motorist coverage would be implicated, and the insurer would have to cover some portion of their damages.

¶14 Biddlecome knew that comparative fault and proportionate liability are the law in Arizona, yet failed to reasonably investigate whether the motorist might be at fault to any degree. After hearing second-hand accounts of the accident from Joanna Sobieski, Biddlecome had reason to question the motorist's story of a pedestrian suddenly entering the intersection, and knew that the motorist might not have used her turn signal. At trial, Biddlecome explained she decided not to interview the other three motorcyclists because she assumed they would be biased in the Sobieskis' favor. Yet, in deciding Sobieski was wholly at fault, she relied entirely on the account of the motorist, who herself would be at financial risk if Sobieski were to sue her for his injuries. Even after the Sobieskis' attorney brought the witness statements to American Standard's attention, Holmes undertook no further investigation, and American Standard stood by its initial determination that Sobieski was entirely at fault.

¶15 These facts together were sufficient evidence from which the jury could find that American Standard acted unreasonably in investigating the Sobieskis' claim and that it knew its conduct was unreasonable or acted with reckless disregard of the reasonableness of its investigation. The insurer knew that when an uninsured motorist claim is made in a comparative-negligence state such as Arizona, even the slightest degree of fault on the part of the uninsured motorist can implicate the policy. It also knew that Sobieski's injuries were so severe that his damages exceeded his policy limits, likely by one or more multiples. Nevertheless, American Standard failed to pursue apparent inconsistencies in the witness accounts that might have revealed that the motorist shared some fault in the accident.

¶16 Accordingly, the superior court did not err in denying American Standard's motions for judgment as a matter of law and for new trial on the Sobieskis' claim for breach of the duty of good faith and fair dealing.[2]

---

[2] On appeal, American Standard does not take issue with the amount of compensatory damages the jury awarded to the Sobieskis.

## C. Punitive Damages.

### 1. Legal principles.

¶17 A breach of the duty of good faith and fair dealing is not sufficient, by itself, to support a claim for punitive damages. Our supreme court has explained the difference between the evidence required to prove an insurer's breach of the duty of good faith and that required to support an award of punitive damages:

> Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or "malice," or a fraudulent or evil motive on the part of the defendant, or . . . a *conscious and deliberate disregard* of the interests of others . . . . We restrict [punitive damages] to those cases in which the defendant's wrongful conduct was guided by evil motives. Thus, to obtain punitive damages, plaintiff must prove that defendant's evil hand was guided by an evil mind. The evil mind which will justify the imposition of punitive damages may be manifested in either of two ways. It may be found where defendant intended to injure the plaintiff. It may also be found where, although not intending to cause injury, defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others. . . . Such damages are recoverable in bad faith tort actions when, *and only when*, the facts establish that defendant's conduct was aggravated, outrageous, malicious or fraudulent. . . . When defendant's motives are shown to be so improper, *or* its conduct so oppressive, outrageous or intolerable that such an "evil mind" may be inferred, punitive damages may be awarded.

*Rawlings*, 151 Ariz. at 162-63 (citations omitted). Further, a plaintiff suing for punitive damages must prove the defendant's "evil mind" by clear and convincing evidence. *Linthicum v. Nationwide Life Ins.*, 150 Ariz. 326, 332 (1986). "[A] damage award, punitive or otherwise, must be based on more than mere speculation or conjecture." *Hawkins v. Allstate Ins.*, 152 Ariz. 490, 501 (1987).

¶18 "Punitive damages are appropriate 'only in the most egregious of cases,'" upon proof of both "the defendant's 'reprehensible conduct' and 'evil mind.'" *SWC Baseline & Crismon Inv'rs, L.L.C. v. Augusta*

*Ranch Ltd. P'ship*, 228 Ariz. 271, 289, ¶ 74 (App. 2011) (quoting *Sec. Title Agency, Inc. v. Pope*, 219 Ariz. 480, 498, ¶ 81 (App. 2008)). Accordingly, our supreme court has made clear that an insurer does not open itself to punitive damages simply by considering its own interests in denying a claim. *Gurule v. Ill. Mut. Life & Cas. Co.*, 152 Ariz. 600, 607 (1987) ("Self interest is not, however, evidence of an 'evil mind.'"). Because punitive damages may be awarded only when they will serve to punish a "defendant [that] acted with an 'evil mind,'" *id.* at 601, "the defendant's motives are determinative," *Bradshaw v. State Farm Mutual Automobile Insurance*, 157 Ariz. 411, 422 (1988).

### 2. Alleged undue profit pressures affecting handling of the claim.

**¶19** At trial, the Sobieskis did not contend American Standard intended to injure them by denying their claim without a reasonable investigation. Neither did the Sobieskis question American Standard's claims-handling policies; their expert admitted those policies were reasonable. Nor did the Sobieskis offer evidence that American Standard deliberately engaged in routine claims practices designed to benefit itself at the expense of its insureds. *Cf. Hawkins*, 152 Ariz. at 498 (insurer routinely shorted insureds by small amounts and imposed small charges on them, effectively betting that few insureds would object). The Sobieskis instead argued American Standard was liable for punitive damages because its breach of the duty of good faith was driven by business policies that compelled the company's claims handlers to favor corporate profits at the expense of its insureds. Citing *Bradshaw*, the Sobieskis contend on appeal they offered sufficient evidence that American Standard acted to serve its own interests, with "reason to know and consciously disregarding a substantial risk that [its] conduct might significantly injure" them. *Bradshaw*, 157 Ariz. at 422; *see also Gurule*, 152 Ariz. at 602.

**¶20** The Sobieskis liken American Standard's conduct to that of the insurer in *Nardelli v. Metropolitan Group Property & Casualty Insurance*, 230 Ariz. 592 (App. 2012). In concluding punitive damages were warranted in that case, we cited evidence that the insurer "instituted an aggressive company-wide profit goal"; "assigned to the claims department a significant role in achieving that goal"; "aggressively communicated this goal to the claims department" and to the employees handling the plaintiffs' claim; and "tied the benefits of claims offices and individuals to, among other things, the average amount paid on claims"; all "without taking steps to ensure its efforts to drive up its corporate profits would not affect whether it treated its insureds fairly." *Id.* at 605, ¶ 62. This evidence, we said, enabled the jury

to find that decisions the insurer made in handling the plaintiffs' claim "were driven by financial self interest and not by the merits" of the claim. *Id.* The Sobieskis argue they presented evidence that American Standard's handling of their claim was influenced, as in *Nardelli*, by a mandate from management to the claims department to reduce the amount paid on personal injury claims. In considering that contention, we first review the evidence in *Nardelli*, then look closely at the evidence in the record here.

**¶21** In *Nardelli*, after the insurer publicly announced a profit goal of $155 million, the president of the company told claims employees he expected their department "to absorb all of the normal inflation" so that the company could recognize profits from savings in other departments. *Id.* at ¶ 64. Claims workers were warned that if the company did not meet its overall profit goal, their division would be sold. As a result, the president wrote to managers, "reaching our [earnings] goal . . . is not optional - it is a business promise . . . and it must be met with resolve . . . . Everything counts and everyone counts." *Id.* The record in *Nardelli* demonstrated that claims employees understood their jobs were in jeopardy if the company-wide profit goal – the one to which their department was expected to significantly contribute – was not met. *Id.* at ¶ 65. During detailed "Roadshow presentations," senior claims officers informed every claims employee that the company "had adopted a policy to 'be tougher on claims' in which 'every dollar counts, and we'll do it one claim at a time.'" *Id.* at 606, ¶ 67. The company "communicated a corporate policy to 'every associate' that emphasized they should keep the $155 million target in mind when evaluating every aspect of every claim." *Id.* at ¶ 68.

**¶22** Significantly, the insurer in *Nardelli* "tied each claims office's compensation" to average claim payouts (also called "severities"), "with resulting effect on individual compensation." *Id.* at ¶ 67, n.21, ¶ 69. The company "imposed severity goals on the [local] office and managers" that had handled the plaintiffs' claim. *Id.* at ¶ 69. To assess whether individual claims offices were contributing sufficiently to company profit goals, the insurer used "claims balance scorecard[s]" that gave average claim payouts greater weight than any other factor. *Id.* at 607, ¶ 70. A third of the incentive pay awarded each claims office was driven by that specific office's performance on the "scorecard." *Id.* at ¶ 71. As management explained to employees, "additional incentive money [would be] available to those employees and offices that . . . made the greatest contribution to the 2001 results of both the Claim Department and the Company." *Id.* at ¶ 71, n.25. Consistent with the notion that claims employees were paid based on whether they limited payouts, their performance reviews noted when they "fell short of expectations" in maintaining payout averages. *Id.* at ¶¶ 72-73.

¶23 On that record, we held the jury reasonably could have concluded that claims employees "were to decide every aspect of every claim based on making $155 million in profits." *Id.* at 609, ¶ 79. Given the evidence that the company "was in a make or break situation," with "palpable" pressure on claims employees who knew they would be laid off if the profit goal was not met, the jury reasonably could have found that those concerns drove the manner in which adjusters handled the plaintiffs' claim. *Id.* at ¶ 80.

¶24 Here, the Sobieskis argue that claims workers denied their claim because of similar undue pressure from American Standard to promote company profits at the expense of insureds. The Sobieskis cite five broad categories of evidence: Claims department business plans, company-wide incentive-pay programs, employee performance reviews and personnel files, claims-manager training materials, and a mandate to claims employees to focus on comparative negligence in adjusting claims.

¶25 Addressing the business plans first, the Sobieskis contend they offered evidence that beginning in about 2002, American Standard "imposed a plan to turn its claims department into a profit center by setting arbitrary goals to pay less than its competitors" on bodily injury claims. But the business plans in evidence do not support that contention. The plans set no "arbitrary goals" for claims payouts and, by contrast to the insurer's exhortations in *Nardelli*, they did not direct adjusters to keep company profits in mind when settling claims. "[A] company keeping statistics on resolution of claims and looking to their 'bottom line' are reasonable internal procedures; particularly when Plaintiff has offered no evidence that this behavior ever resulted in the denial of a legitimate (or illegitimate) claim." *Knoell v. Metro. Life Ins.*, 163 F. Supp. 2d 1072, 1078 (D. Ariz. 2001).

¶26 To be sure, in some years before Sobieski's accident, business plans for American Standard's claims department in Arizona highlighted that, on average, the company was paying out less than its competitors on comparable personal injury claims. Business plans adopted before 2006 called on department leaders to "manage the gap," an apparent reference to those payout margins. But an insurer does not open itself to punitive damages simply by taking steps to monitor profitability. An insured seeking punitive damages must show clear and convincing evidence that the insurer's concern for profits drove the company to breach its duty of good faith and fair dealing to the insured.

¶27 Entirely lacking in this record is any evidence that, as in *Nardelli*, company officers directed adjusters to reduce claims payouts to

enhance the company's bottom line. In that case, in recorded presentations to the various claims offices, management "communicated a corporate policy to 'every associate' that emphasized they should keep the $155 million target in mind when evaluating every aspect of every claim." 230 Ariz. at 606, ¶ 68. By contrast, the American Standard business plans the Sobieskis offered in evidence did not impose on claims workers any overriding mandate to boost company profits by reducing claims payouts; to the extent the plans mentioned claims payouts at all, the strategies they identified were hardly inappropriate.

¶28 The plans, which were circulated to managers such as Nick but not to adjusters such as Biddlecome or Holmes, set out goals and corresponding strategies for the company's Arizona claims operations. Typically ten pages long, the plans were issued at the beginning of the calendar year and quarterly throughout the year. At the outset, each plan stated, "The American Family Claim Division state business plans align initiatives and activities with customer service and other divisional and corporate goals."

¶29 The 2006 plan identified as "Key State Issues: Customer Satisfaction; Collision, Comprehensive and Property Severity." The first four pages of the 2006 plan recited various specific actions aimed at improving "customer satisfaction." For example, the first such "initiative" was, "Adjusters will explain each loss in person or on the telephone . . . . Each loss is explained with the written Claim Settlement Report given to the insured." Another initiative was that "[a]djusters will be trained to consistently explain the claim handling process and keep the customer informed throughout the claims process." Page eight of the 2006 plan was titled, "Bodily Injury Severity." At the top of that page was the following:

> Our overriding philosophy is to pay what we owe. In this plan, we have established specific initiatives and activities that will ensure we adhere to our philosophy of paying what we owe. Listed below is Fast Track data for comparison. The expectation is that where the measurement is over 100.0%, claim personnel will work toward trending downward and where the measurement is under 100.0%, claim personnel should try to manage the gap.

The identified "Initiative" for "manag[ing] the gap" was to "[m]aintain focus through quality file handling techniques." Under the "Activities" to be performed toward the goal to "manage the gap," the plan stated, "Thorough

Investigations, proper application of comparative negligence and fair settlements."

**¶30** References to "manage the gap" were removed from claims department business plans before Sobieski's accident. The only reference to bodily injury claims-handling in the seven-page 2007 Arizona plan was an "Initiative" labeled "Control Severity," which was to be achieved by "[h]av[ing] more manager involvement reviewing files for timely and thorough investigation and suspense activity to update the file."[3] The 2008 business plan contained no reference to severity rates or average industry claim payouts. Instead, that plan called for "Exceptional Claims Experiences." It emphasized communicating with the insured and "[m]aking claim payments that are accurate and fair," and "Pay What We Owe."

**¶31** In sum, contrary to the Sobieskis' contention, the business plans American Standard adopted for the claims department immediately before, during and after the period in which the insurer denied the Sobieskis' claim contain no support for the assertion that the company sought to turn its claims department into a "profit center" at the expense of its insureds.

**¶32** Second, again citing *Nardelli*, the Sobieskis argue the jury could have found that American Standard's compensation policies caused claims employees to deny their request for coverage. But in *Nardelli*, the insurer calculated average claim payments for each claims office and tied a worker's compensation to his or her office's average. 230 Ariz. at 606, ¶ 69. By contrast, the record here contains no evidence that any specific severity goal was imposed on the claims office that handled the Sobieskis' claim or that compensation paid to claims employees was linked to their success in limiting claims payouts.[4]

---

[3] The 2007 plan contained headings labeled "Customer Satisfaction," "Agency Partnership," "Employee Engagement" and "Loss Costs" for various categories of damage. Among the bullet points under the "customer satisfaction" heading were "Explanation of the claim payment" and "Fairness of the claim settlement amount."

[4] The Sobieskis' expert witness agreed that American Standard's compensation policies did not tie a claims employee's compensation to that employee's personal severity performance.

¶**33**      The Sobieskis argue, however, that American Standard employees stood to receive annual bonuses through a "Corporate Incentive Plan" that was based in part on claims payouts. By contrast to the bonus plan in *Nardelli*, however, the American Standard incentive plan was a company-wide profit-sharing program in which all employees could be rewarded in accordance with the company's overall performance on specified measures. At the relevant time, incentive payments under the American Standard profit-sharing program were based on four factors, each of which was given equal weight: (1) Return on equity (meaning the degree to which the company successfully managed its investment assets), (2) growth in the number of policies in force, (3) policy retention rate and (4) the amount that the company contributed to the plan (a sum that, according to the record, was "based on annual operating results"). No component of the American Standard incentive plan was comparable to the severity-based bonuses paid to claims employees in *Nardelli*. The Sobieskis cite a sentence in the compensation plan that stated, "The Program is designed to encourage each employee to focus on how he/she, in his/her day-to-day work, can help the Company meet its strategic goals." Nothing in that general statement can be taken as a directive to claims employees to short-change insureds on valid claims or, more specifically, as evidence that claims employees denied the Sobieskis' claim in order to boost the company's contribution to the profit-sharing plan.[5]

---

[5]      The Sobieskis point to American Standard's adoption in early 2009 of a revamped Corporate Employee Incentive Plan based on the company's overall performance in five areas, each weighted equally: "Customer Satisfaction," customer retention, net premium growth, return on equity, and "combined ratio." The company's "Customer Satisfaction" was measured by a survey of customers by a third-party research firm; "Customer Retention" was the percentage of policies retained on a rolling 12-month basis, including new policies written during that period; and "New Premium Written Growth" was a calculation reflecting the sale of new policies, customer retention and rates. It is true that the "combined ratio" measure related amounts paid on claims to income from premiums. But use of the company-wide ratio as one of five elements of a profit-sharing plan is a far cry from the insurer's directive to claims employees in *Nardelli* that they were expected to manage claims in a way to cover inflationary pressures for the entire company. Moreover, by the time the 2009 plan was adopted, the insurer already had denied the Sobieskis' claim and rejected their lawyer's demand letter. (The Sobieskis argue that Nick testified that his bonus in 2008 was based in part on company-wide loss

¶34          Third, the Sobieskis argue that claims employees' personnel files reflect management pressure to reduce amounts paid on claims. The Sobieskis point to a single line in a log in which Nick, the claims department supervisor, documented his interactions with adjusters who worked for him: "[M]et with staff to discuss their contribution to the profit & hand out bonus checks." This note is contained in an eight-page, single-spaced document that recorded Nick's communications with the claims workers he managed beginning on January 20, 2005 and continuing through December 4, 2007. The log was filled with references to customer service; nothing in it was akin to the documented demands managers placed on claims workers in *Nardelli* to handle claims with a "laser-like focus on meeting" company profit goals. 230 Ariz. at 608, ¶ 74.[6]

¶35          The Sobieskis argue Nick testified that he was evaluated in part on how his claims adjusters controlled severity (meaning, amounts paid out on claims). But, as the Sobieskis' expert witness acknowledged, there is no requirement that an insurer pay more than what it owes on claims. A close review of the record reveals no evidence or inference that Nick encouraged his employees to deliberately short-change insureds to improve company profits or his standing within the company. This was not a *Nardelli* situation in which claims handlers were pressured to enhance company profits by cutting payments to insureds, or that management "impressed upon its claims employees . . . that they were to decide every

_____

ratios, but the company compensation documents in evidence do not support that recollection.)

[6]     The communications recorded in Nick's log concern the quality of claims workers' investigations and include praise for their "very good customer focus." He urged one employee to "work [files] aggressively then deny/pay as appropriate" and others to work harder to stay in touch with customers: "When you can't reach an insured, you need to call the agent and request spouse #, cel# [sic], work# etc. to aggressively pursue insured report/contact"; "Discussed with John to keep current on returning phone calls"; "Discussed call issues with Lucia, [explained] make more than one attempt to contact insd. Call agent for alternate phone numbers." He also urged thoroughness in file management: "Make sure to make immediate contact with all people in your files. Get statements from all people who are hurt. Claimant statements, witness statements are needed in all comp neg files. We owe our insured an aggressive investigation."

aspect of every claim based on making" a profit goal. *See Nardelli*, 230 Ariz. at 609, ¶ 79.[7]

**¶36** The Sobieskis also point to a reference in Holmes' personnel file to "control collision severity." But that phrase appears in a self-evaluation in which Holmes, the second adjuster assigned to the Sobieskis' claim, pledged to address severity by "identify[ing], thoroughly investigat[ing], document[ing], and properly pursu[ing] collision files with subrogation potential." Subrogation, of course, is a lawful and not inappropriate means by which an insurer can pursue recovery from another party's insurer for the fault of the other party. The Sobieskis have no explanation for how an insurer's general focus on subrogation might expose it to liability for a punitive-damage claim by the insured.[8]

---

[7] Nor do the employees' personnel files provide any support for the Sobieskis' contention that American Standard "submerged its claims adjusters in profit concerns" or sought in annual performance reviews to promote the company's "profit-centered practices and goals" at the expense of appropriate claims investigations and payouts. Nick's file reflects that in 2005 he pledged to support "Claim Division Goals: Control Severity, Improve Employee Satisfaction" by granting to his employees "claim authority" consistent with those employees' "responsibilities, training, experience and ability." In a self-evaluation, he wrote, "I have worked hard to get our people to listen to the customer, respond quickly to what they need and to recognize and resolve situations that could escalate and become a larger problem showing them that it saves time to take care of a problem early on." His reviewer responded, "Philip is very committed to quality customer satisfaction and conveys this on a regular basis to his unit," and "Philip is very positive about customer service." Other performance measures reflected in the evaluation forms lend no support to the Sobieskis' contention that employees were encouraged to pay insureds less than what the company owed: "Anticipates and adjusts to customer needs," "Collaborates effectively for the benefit of customers," "Provides exceptional customer service," "Measures customer value and experience," "Models uncompromising ethics and integrity," "Champions corporate values (caring, helpfulness, ease & convenience, fairness)."

[8] Contrary to the Sobieskis' argument that Holmes must have been driven by concern for American Standard's bottom line when she denied their claim, her personnel file contains plenty of praise from her reviewers for her good customer service during the time in question: "Handles claim

¶37        Biddlecome's file contains praise and guidance for improving customer service, and similarly is devoid of any mandate to keep company profits in mind when adjusting claims.[9]  When Biddlecome's evaluations reference "controlling severity," it is only in the context of entirely appropriate acts that an insurer might take to ensure that it pays no more than what it owes on a claim.[10]

¶38        In sum, notwithstanding the Sobieskis' contention, employee personnel files in the record offer no support for the argument that

negotiations by settling and providing the best customer experience in the industry."  "Verna is proactive in her discussions with her customers to be sure they are prepared for the claim process."  "Verna displays genuineness in dealing with others.  She conveys a willingness to help that lends itself to reaching agreement on situations that invoke conflict.  She delivers difficult messages with tact and diplomacy."  "Verna takes care of people's problems, needs and explains the process thoroughly, thus setting the [stage] for successful negotiations.   Verna seldom sees her files go to suit and yet pays what we owe on the claims she is presented."   Her self-evaluations were along similar lines: "To increase customer satisfaction and to control severity, I will answer demand letters and extend an offer within the date requested on each letter."  "To improve customer and employee satisfaction, I will respond timely and appropriately to all customer communications."

9        "Katie is a good listener.  She communicates well with her customers making sure that she explains the process thoroughly and asks questions to verify what people need in relation to their claim."  "Katie has a passion for taking care of her customers whether the[y] b[e] claimants or insured's [sic]. . . .  Katie wants people's problems to be taken care of.  I appreciate this as do her customers."  "Katie is customer focused."  "Always listen to the customer and their concern, and understand why or how they could be feeling that way.  Work to resolve any issues.  Investigate, review and completely understand all points before delivering what may be difficult news.  If the customer disagrees, listen to what they have to say and address those concerns.  Must also be firm, but with the respect that the customer deserves."

10        "To control collision severity, I will refer a minimum of three to five files per month to the subrogation department."  "To improve customer satisfaction and collision severity, I will complete file set up and make contact within one (1) business day of receipt of a new loss.  I will continue to follow up until required initial information is obtained."

American Standard management encouraged claims workers to arbitrarily or unreasonably deny claims.

¶39 Fourth, the Sobieskis cite training materials for company claims managers, noting that one of the topics was "How can a manager control severity." But the answer stated in the materials belies the Sobieskis' contention that the company trained its managers to control severity by short-changing claimants:

> By using the tools that we've provided [claims managers] by exercising the curiosity that they had as an adjuster. About the claims that they supervised. By developing that curiosity in the people who work for them so that we have these great investigations, so that you develop a file so that there aren't any questions about it. So that you can apply your comparative negligence if there is one. So that your file supports the information that's in it, so that people know what needs to be done.

¶40 Fifth, the Sobieskis argue the punitive damage award was supported by corporate documents urging claims employees to take into account principles of comparative fault when they adjust claims. The Sobieskis argue that American Standard encouraged adjusters to assess comparative fault, even one percent comparative fault where appropriate, on the theory that "it all adds up."

¶41 In a state such as Arizona that recognizes comparative negligence (comparative fault), when an insurer receives a claim from someone injured in an accident with a company policy-holder, the insurer's liability for the third-party claimant's damages may be reduced to the extent that the claimant is at fault in the accident, even to a small degree. Similarly, when the insurer's policy-holder is injured in an accident with a third party, even if the policy-holder is principally at fault, to the extent the third party also is at fault, that party's insurer is proportionately liable. Notwithstanding the Sobieskis' argument, there is nothing wrong in the abstract with an insurer seeking to lay off an appropriate share of the liability on a third party's insurer when the third party is at fault.

¶42 The record contains no support, moreover, for the proposition that an improper company focus on comparative fault drove American Standard to deny the Sobieskis' claim. To the contrary, the Sobieskis contend the insurer acted in bad faith by failing to apply comparative fault principles to their uninsured-motorist claim. That is, they argue American

Standard should have recognized that under Arizona's comparative-fault regime, even a small amount of fault on the part of the motorist with whom Sobieski collided would open the insurer to liability for some part of its policy limits.[11]

¶43        As outlined above, the Sobieskis did not question American Standard's claims policies; nor did they argue American Standard denied their claim because it intended to harm them. Instead, citing *Nardelli*, the Sobieskis argued their claim was denied because of business policies and programs at American Standard that compelled claims adjusters to promote company profits at the expense of its insureds. A close review of the evidence on which the Sobieskis rely, however, reveals nothing resembling the *Nardelli*-like profit-driven atmosphere the Sobieskis argue existed at American Standard. In the absence of corporate programs or compensation or evaluation policies that favored company profits over the interests of insureds, the Sobieskis cite isolated phrases in business plans and other records, but those isolated phrases are wholly insufficient to constitute the clear and convincing evidence required to support their claim for punitive damages.

¶44        We have discussed *Nardelli* at some length because that case is the centerpiece of the Sobieskis' argument on appeal that American Standard acted with a conscious and deliberate disregard of the rights of its insureds in denying their claim. We do not mean to imply that a punitive-damage claim against an insurer necessarily will fail in the absence of facts as egregious as those in *Nardelli*. To the contrary, each case will depend on its own distinct facts; that is why we have cited and quoted from the record at length in evaluating the Sobieskis' contention that the jury in this case heard and saw clear and convincing evidence of the requisite "evil mind."

¶45        Our close review makes clear that the record contains no evidence that American Standard's business plans, employee evaluations, compensation programs or training materials were designed or applied with the purpose of arbitrarily reducing or denying claims to further the

---

[11]        The Sobieskis also argue American Standard knew the accident had put Sobieski out of work for a year or more, thereby rendering the Sobieskis in particular need of the uninsured motorist benefits they had purchased from American Standard. But knowledge of the harm that denial of a claim will cause an insured, without evidence the insurer deliberately ignored the insured's "rights and needs," is not sufficient to establish the "evil mind" required to support an award of punitive damages. *Linthicum*, 150 Ariz. at 333.

company's bottom line, or that those plans, materials or programs had any inappropriate effect whatsoever on how claims employees handled the Sobieskis' claim. The Sobieskis' expert witness testified that American Standard's business policies "could" or "might" result in pressure on the claims department because he had seen that happen in other insurance companies. But "expert opinion evidence based on sheer speculation is not competent." *Aida Renta Trust v. Maricopa County*, 221 Ariz. 603, 611, ¶ 19 (App. 2009). An award of punitive damages must be supported by clear and convincing evidence of the requisite "evil mind." The record here contains no such evidence.

## D.    Rule 68 Sanctions and Attorney's Fees.

**¶46**         American Standard urges us to vacate the attorney's fees and Rule 68 sanctions awarded to the Sobieskis. The court awarded the Sobieskis $364,963 in attorney's fees pursuant to A.R.S. § 12-341.01 (2016). American Standard does not question the statutory authority for the fees award, but argues that to the extent any part of the judgment is vacated, the fees award should be remanded. Given that we have affirmed the compensatory damages verdict but reversed the punitive damages verdict, we vacate and remand the attorney's fees award for reconsideration by the superior court.

**¶47**         The Sobieskis served American Standard with a pretrial offer of judgment in the amount of $70,000, which American Standard rejected. Because the compensatory damage verdict exceeded the Sobieskis' offer of judgment, we affirm the sanctions of double taxable costs and expert witness fees imposed pursuant to Arizona Rule of Civil Procedure 68.

¶48 American Standard and the Sobieskis both request costs and their fees on appeal pursuant to A.R.S. § 12-341.01. We deny both requests.

**CONCLUSION**

¶49 For the reasons stated above, we affirm the judgment and award of compensatory damages on the Sobieskis' claim for breach of the covenant of good faith and fair dealing and affirm the Rule 68 sanctions. We reverse the award of punitive damages, vacate the award of attorney's fees and remand to the superior court for further proceedings consistent with this opinion.



AMY M. WOOD • Clerk of the Court
FILED: AA