NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

ALEJANDRO PRECIADO, *Plaintiff/Appellee,*

*v.*

YOUNG AMERICA INSURANCE COMPANY, *Defendant/Appellant.*

No. 1 CA-CV 16-0082
FILED 6-29-2017

Appeal from the Superior Court in Maricopa County
No. CV2012-097512
The Honorable David K. Udall, Judge

**AFFIRMED IN PART; REVERSED IN PART; REMANDED**

COUNSEL

Schneider & Onofry, P.C., Phoenix
By Charles D. Onofry, Luane Rosen
*Counsel for Defendant/Appellant*

Arnett & Arnett, P.C., Chandler
By Wayne C. Arnett, Mark W. Arnett
*Co-Counsel for Plaintiff/Appellee*

Randolph G. Bachrach, Attorney at Law, Chandler
By Randolph G. Bachrach
*Co-Counsel for Plaintiff/Appellee*

---

**MEMORANDUM DECISION**

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Samuel A. Thumma and Judge James P. Beene joined.

---

**W I N T H R O P**, Judge:

¶1        Young America Insurance Company ("Young America") appeals the judgment entered after a jury found Young America liable for compensatory and punitive damages stemming from its conduct surrounding the handling of Alejandro Preciado's insurance claim.  Young America argues the trial court erred in two of its instructional rulings and in a ruling on a motion *in limine*; erred in not granting its motions for judgment as a matter of law on Preciado's breach of contract and punitive damages claims; and erred in denying its motion for a new trial.  Young America also challenges the jury's breach of contract and punitive damages awards and the trial court's award of attorneys' fees and costs.  For the following reasons, we affirm the challenged instructional rulings and the ruling on the motion *in limine*.  We reverse the order allowing the issue of punitive damages to go to the jury.  We vacate the jury's breach of contract award and remand for the entry of a modified award.  Finally, we affirm the award of attorneys' fees, but vacate the award of costs and remand for the entry of a modified award.

## FACTS AND PROCEDURAL HISTORY

¶2        In 2010, Preciado bought a 2000 Ford F-350 from a friend and purchased general liability insurance through Young America.  In August 2011, Preciado was having financial problems and borrowed $4,000 from a title loan company, which placed a lien on his truck.  The loan agreement required that Preciado's truck have comprehensive and collision insurance, and Preciado consequently obtained that additional coverage through Young America.  Young America's insurance policy stated that, in the event of theft, Young America would be liable for the "actual cash value" of the vehicle.

¶3        Approximately a month after increasing insurance coverage on his truck, Preciado drove his truck to his sister's house for a family gathering.  His niece gave him a ride home that night, and he left his truck at his sister's house.  The next day, Preciado did not go pick up his truck

because he was using a different vehicle. Two days later, Preciado discovered his truck had been stolen from his sister's house. He immediately reported the incident to the police and Young America.

¶4 Young America took a recorded telephonic statement from Preciado and sent him a "theft packet," which included various forms for him to complete and return. After researching the value of the truck, Preciado completed a sworn statement of loss, claiming $13,800 for the truck.

¶5 Young America referred the claim to its special investigations unit "for investigation of a questionable theft," and requested that Preciado appear for an examination under oath. An attorney for Young America administered the examination under oath and later requested additional documents from Preciado, such as phone records, contact information for certain individuals, and copies of checks. In an email to Young America's special investigations unit manager, the attorney stated that although Preciado was "cooperative and responsive," he was "not entirely forthcoming with his financial information." Young America's attorney also noted that, due to Preciado's "abysmal" finances, "there is significant financial motive in this claim," but "[t]he lack of recovery [of the vehicle] makes any declination [of the claim] difficult because we are not able to eliminate theft as a possible explanation for the vehicle's disappearance."

¶6 Preciado gathered the information the attorney requested and sent it to Young America in January 2012. In February 2012, the police notified Young America that the truck had been located in a remote area of Nogales, Mexico, and that it would be difficult, if not impossible, to recover. At approximately that same time, Young America's special investigations unit approved payment of Preciado's claim.

¶7 The following month, a Young America adjuster offered Preciado $11,597.17 to settle the claim.[1] Preciado told the adjuster that he had looked up the value of the truck, and that offer was "very low." He stated that he "would consider the [insurer's] offer once [Young America] provided [him] with [information on] how they came up on that number."

---

[1] Young America apparently calculated its offer by using a National Automobile Dealers' Association (NADA) valuation. The offer included Young America's determination of the actual cash value of the vehicle, $10,712.50, plus approximately $885 to cover tax and the cost of the truck's registration tag.

For the next several months, Preciado attempted to contact Young America to obtain the documentation and support for its offer. Preciado never received any documentation from Young America showing how Young America calculated its offer.

¶8            In May 2012, the Texas Department of Insurance approved the acquisition of Young America by Alfredo Joseph Loya, a Texas resident, and the following month the Preciado claim file was transferred from Young America's office in South Carolina to a Fred Loya Insurance ("Fred Loya") claims office in Austin, Texas.[2]

¶9            On July 10, 2012, Fred Loya closed the claim file for "lack of cooperation" by Preciado. Three weeks later, Preciado contacted Young America and was told by an adjuster that his claim number "was no good," his file had been "lost," and they would assign his case to a new claims adjuster.

¶10            Preciado made multiple follow-up calls attempting to "find out how they got that number for what they were offering [him]" and to resolve the claim. In the fall of 2012, Young America reopened Preciado's claim and assigned it to a Fred Loya adjuster, Arturo Saldana, who sent Preciado another "theft packet" indicating the carrier was investigating his claim again and requesting he complete more forms, including another affidavit of theft. Saldana then renewed Young America's original offer of $11,597.17, conditioned on Preciado again providing a copy of the police report and the affidavit of theft. When Preciado declined to complete and resend the same documents he had previously provided, Saldana sent Preciado a letter indicating that any further handling of his claim would be under a full reservation of rights because of Preciado's "failure to submit legal notices or papers."

¶11            In December 2012, Preciado, through counsel, filed a complaint against Young America, seeking compensatory damages for breach of contract and breach of the duty of good faith and fair dealing. Preciado also alleged Young America's actions justified an award of punitive damages. Two days later, Young America notified Preciado it would be sending him a check for $10,712.50, less $3,213.75 for the estimated salvage value of the vehicle, for a total of $7,498.75. The letter informed Preciado that, if he chose "not to retain the salvage," Young

---

[2]     It appears that Young America continued to operate as an entity under the Fred Loya corporate umbrella, with further handling of this claim out of the Fred Loya Austin office.

4

America would "issue the remaining amount of $3,213.75" upon Preciado's proper completion of a power of attorney form.[3]  The check was never cashed, and Preciado asserted that he did not receive it, even though Young America's counsel wrote to Preciado's counsel affirming the amount had been tendered and the check had been deposited.  Several months later, Young America sent a "replacement check" in the amount of $7,498.75, acknowledging that "the check previously issued in December 2012 . . . was never delivered and has been stale dated by Young America."  Preciado rejected the check.  Over the next year and a half, the parties were unsuccessful in their attempts to negotiate a final settlement.[4]

¶12        In March 2014, the Arizona Department of Insurance ("DOI") concluded a target market conduct examination of Young America to evaluate the company's compliance with Arizona insurance statutes and regulations.  The DOI concluded that, among other things, between 2012 and 2013, Young America "fail[ed] to promptly investigate claims within thirty (30) days after receipt of the claim notice" and "fail[ed] to maintain all notes and work papers pertaining to claim files in such detail that pertinent events and the dates of such events can be reconstructed."  In order to resolve the matter without formal proceedings, Young America entered a consent order with the DOI in July 2014, admitting noncompliance with multiple statutes and regulations, agreeing to pay a

---

[3]        Because the now-heavily damaged vehicle was eventually located on a mountaintop in Mexico in an area controlled by a drug cartel, both parties agreed "the salvage for th[e] vehicle [wa]s not obtainable by anyone."  Internal memos in Young America's file at the time appear to concede (1) that the vehicle likely could not be safely recovered and (2) that it likely had little to no salvage value.  Nevertheless, Young America continued to request that Preciado provide a power of attorney to allow transfer of title to the insurer and, if Preciado did not do so, the total loss payment would be reduced by the salvage value of a vehicle the company knew had no salvage value and one that Preciado had no reasonable access to.  At trial, Saldana testified that he sent Preciado the power of attorney form, but Preciado never returned it.  Preciado testified that he could not recall whether he signed and returned the form, but a supplement to the original police report indicated that Young America was the "registered owner" of the vehicle.

[4]        Young America also served an offer of judgment on Preciado, which Preciado did not accept.  In January of 2014, Preciado accepted Young America's check in the amount of $11,597.17 without prejudice to his rights to proceed with his bad faith claim.

civil penalty of $42,000, and agreeing to implement certain corrective actions to prevent further violations from occurring. Notwithstanding the allegations in Preciado's pending case of untimely claims handling and incomplete claims documentation, Young America did not disclose the consent order to Preciado in this case.

¶13 Also in March 2014, Preciado's counsel deposed Arturo Saldana, the Fred Loya insurance adjuster who was involved in the handling of Preciado's reopened claim after Young America was acquired by Fred Loya. When asked about the previous settlement offers Young America made to Preciado, the following exchange took place between Preciado's counsel and Saldana:

> [Preciado's counsel]: But you know that you owe the retail number, the high blue book, right?
>
> Saldana: You will have to clarify that. I'm not too sure.
>
> [Preciado's counsel]: Well, if he's going to go out and buy a new truck with the money that this insurance company gives him, he's going to go out and buy it retail, isn't he?
>
> Saldana: Actually, we wouldn't pay retail.
>
> [Preciado's counsel]: You wouldn't?
>
> Saldana: Huh-uh.
>
> [Preciado's counsel]: Why not?
>
> Saldana: We pay the value of the vehicle. We don't pay retail.
>
> [Preciado's counsel]: Well, isn't that the idea of this, so he can go out and by [sic] another truck?
>
> Saldana: No. He insures the value of the vehicle, and we pay him out the value of the vehicle.
>
> . . .
>
> [Preciado's counsel]: Well, let's put it in your shoes. You say you don't pay the retail amount. If you had done a report

from NADA and gotten a value from them, you would have looked for the wholesale value, not the retail one?

. . .

Saldana: If I ran NADA, but I don't know how a NADA works. I don't ever see wholesale or retail, the difference between the two. I take that back. I do see the difference. But we go with the value of the vehicle, not the retail, so . . . [.]

[Preciado's counsel]: So you would be looking at the wholesale value, not the retail value?

Saldana: That's what it would be.

**¶14**        Later that year, in a pretrial motion, Preciado moved to strike Young America's expert on the basis that the expert improperly calculated the value of Preciado's truck "based on the wholesale auction value," rather than the value an insured would have to pay to replace the vehicle in the retail market. In the same motion, Preciado requested the court "issue an order giving the proper interpretation of 'actual cash value' in this insurance policy." The court denied Preciado's motion to strike Young America's expert, but did not immediately issue an order interpreting the phrase "actual cash value."

**¶15**        Trial in this matter was set for May 4, 2015. In November 2014, Preciado's trial counsel independently obtained a copy of the DOI consent order. Because of "a mistake in routing the documents" between the two different law firms representing Preciado, he did not personally review the consent order until March 2015.[5] On March 10, 2015, Preciado, through counsel, produced the consent order in a supplemental disclosure statement. Young America moved *in limine* to exclude it, arguing the disclosure was untimely because it was filed "after the discovery deadline had expired" and "less than 60 days before [] trial." In response, Preciado argued that, because Young America was a signatory to the consent order, it was "a document that should have been disclosed by Young America." Additionally, Preciado contended that the consent order was "relevant to

---

[5]        The parties' joint scheduling order required them to exchange final disclosure statements, pursuant to Arizona Rule of Civil Procedure ("Rule") 26.1, by August 29, 2014, and all discovery was to be concluded by October 1, 2014.

show that the failure to investigate Mr. Preciado's claim in a reasonable time and properly document the claims file was not an inadvertent error, but part of a pattern and practice of Young America" and that it was "evidence of Young America's state of mind," all relevant to the issue of bad faith and the potential for an award of punitive damages.

¶16         After hearing oral argument, the trial court denied Young America's motion *in limine*, finding the consent order "relevant in these proceedings" because the DOI's findings and conclusions of law "are the same allegations with respect to this case."  The court also found that Young America "would not be surprised by the contents of the Consent Order and would not be prejudice[d] by allowing [its use] in this case."

¶17         At an earlier pretrial conference in January 2015, Preciado's counsel had again requested the court address "what the proper interpretation of the words actual cash value are in the insurance policy." Young America objected to Preciado's contention that "actual cash value" meant "retail market value," arguing instead that "actual cash value" meant "the fair market value."  The court asked counsel for both parties if it would be acceptable "if the understanding is . . . it's retail market value, but each side will be allowed the opportunity to present evidence and persuade the jury one way or the other . . . what retail market value actually consists of[.]" Young America then questioned the need for an order in the first place, but ultimately conceded that an insured who is entitled to the actual cash value of his total loss vehicle is entitled to the retail value, not the wholesale value.  The trial court subsequently ordered and later instructed the jury that "the proper legal interpretation of 'actual cash value' in the Young America Insurance policy means its *retail* market value."

¶18         Before trial, Young America moved for partial summary judgment on Preciado's punitive damages claim.  The court denied the motion, finding that Young America's handling of Preciado's claim created genuine issues of material fact as to whether punitive damages were warranted.

¶19         During the six-day trial, the jury heard testimony from Saldana, Preciado, Young America's valuation expert, and the Young America attorney who conducted Preciado's examination under oath.

Preciado's counsel referenced the consent order multiple times throughout trial.[6]

¶20          After Preciado rested his case, Young America moved for judgment as a matter of law, *see* Ariz. R. Civ. P. 50(a), on the breach of contract claim (arguing that, beyond the minimal difference in the amount offered and the amount claimed for actual value of the vehicle, there was no proof of any contractual damages), and the punitive damages claim (again arguing that there was insufficient evidence of "an evil hand" guided by "an evil mind").  *See Rawlings v. Apodaca*, 151 Ariz. 149, 162, 726 P.2d 565, 578 (1986) (holding that, "to obtain punitive damages, [a] plaintiff must prove that [a] defendant's evil hand was guided by an evil mind").  Young America also moved for judgment as a matter of law to preclude any bad faith claim extending beyond the takeover of Young America's claims by Fred Loya.  The court denied all of these motions.  Additionally, the court denied Young America's request to include an instruction and a form of verdict to allow the jury to apportion fault to Preciado relative to his bad faith claim.

¶21          At the conclusion of trial, the jury found in favor of Preciado, awarding $100,000 in compensatory damages and $750,000 in punitive damages for his bad faith claim, and $34,500 for his breach of contract claim.  Additionally, the court awarded Preciado more than $300,000 in attorneys' fees, costs, and interest.

¶22          Young America filed a motion for a new trial, which the court denied.  Young America timely appealed, and we have jurisdiction pursuant to the Arizona Constitution, Article 6, Section 9, and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) (2016) and 12-2101(A)(1), 5(a) (2016).

**ANALYSIS**

    I.      *Interpretation of "Actual Cash Value"*

¶23          As an initial matter, we address Young America's argument that the trial court erred in its pretrial ruling interpreting the phrase "actual cash value" in the insurance policy to mean "retail market value."  According to Young America, the trial court should have interpreted the

---

6       The trial court redacted the consent order before it was produced to the jury, such that the DOI's findings, conclusions of law, and orders only pertaining to Young America's noncompliance with certain statutory and regulatory violations were admitted.

policy language and instructed the jury that, in this context, "actual cash value" means "fair market value." On appeal, Young America argues that, applying a definition of fair market value, it was entitled to adjust for depreciation and physical condition of the vehicle, and that the court impermissibly "rewrote" the insurance contract. We review *de novo* a trial court's interpretation of the meaning of terms in an insurance contract. *Mendota Ins. Co. v. Gallegos*, 232 Ariz. 126, 129, ¶ 8, 302 P.3d 651, 654 (App. 2013).

**¶24**     Here, the parties agreed that the insurance policy required Young America to pay Preciado the "actual cash value" of the insured vehicle in the event of theft or a total loss. The meaning of "actual cash value" was not defined in the policy, however, and in pretrial proceedings the parties agreed the term was ambiguous, but disagreed as to how the trial court should interpret it.

**¶25**     Our review of the record indicates that the purpose of the trial court's order interpreting "actual cash value" to mean "retail market value" was to clarify and acknowledge the parties' explicit agreement that "actual cash value," as it pertained to the policy at issue, did not mean "wholesale value."[7] Because Young America confirmed it did not intend to argue Preciado was only entitled to the wholesale value of the truck and affirmatively conceded that the "retail value" is the appropriate definition for determining the actual cash value of a total loss claim, we find no error in the trial court's ruling.[8] Moreover, even assuming the meaning of "actual

---

[7]     Such agreement and order also seems consistent with the direction provided by the DOI in its administrative regulations concerning valuation of total loss automobile claims. *See* Ariz. Admin. Code R20-6-801(H)(1)(b).

[8]     Young America also asserts that Preciado's counsel obtained this ruling through "trickery and deceit." At oral argument, counsel for Young America stated his belief that the purpose of the pretrial status conference was to pick a trial date, and because of a scheduling conflict, he sent another lawyer to cover that conference, apparently not expecting that any substantive issue would be raised or resolved. We see no indication in the record that Preciado's counsel acted improperly or dishonestly in his multiple attempts to obtain a pretrial ruling on the interpretation of "actual cash value." Preciado's counsel had previously requested the ruling at an October 2014 conference, in his motion to strike Young America's expert, and in his reply to Young America's response to his motion to strike. Although the trial court denied Preciado's motion to strike Young America's expert, it did not rule on or address Preciado's request for an

cash value" and/or "retail market value" arguably remained unclear, it was appropriate for the jury to determine the meaning of such terms. *See, e.g.*, *Pasco Indus., Inc. v. Talco Recycling, Inc.*, 195 Ariz. 50, 62, ¶¶ 51-52, 985 P.2d 535, 547 (App. 1998) (stating that, although the issue of whether a contract is ambiguous is a question of law, "[i]f a contract is ambiguous, the parties may offer evidence to help interpret it, and the construction thus becomes a question for the jury").

**¶26** Indeed, the court specifically advised counsel they could try to persuade the jury as to their respective views as to how the jury should interpret and apply these terms, and at trial, Young America presented evidence and vigorously argued to the jury that "actual cash value" or "retail market value," in the context of this insurance agreement and under the facts of this case, meant Young America could take into account the physical condition and depreciation of the vehicle in making its offer to Preciado.[9] Under these circumstances, we see no error in the court's acceptance of Young America's concession, or in its order and instruction to the jury defining "actual cash value."

---

interpretation of "actual cash value." Therefore, it was not improper for Preciado's counsel to again request that the court address the issue at the January 2015 pretrial conference. Further, the transcript from the January 2015 pretrial conference shows that Preciado's counsel attempted to clarify Young America's position on the interpretation of "actual cash value," and Young America ultimately conceded that the proper interpretation was retail value, not wholesale value. The trial court was in the best position to evaluate the motivations and actions of counsel relative to this issue and, notwithstanding Young America's subsequent attempts to disavow its agreement on the use of "retail value," the court did not alter its ruling. Thus, the record does not support Young America's assertion that Preciado's counsel acted improperly.

[9] At trial, Young America presented evidence that, at the time of the loss, the subject vehicle was a 2000 Ford F-350 truck that had gone through several different owners, had over 180,000 miles of use, and had been in an accident. Counsel for Young America argued to the jury in closing that these factors all significantly affected the retail market value of the vehicle, even assuming with that history it had any retail market value.

## II. Comparative Bad Faith

¶27 Young America also challenges the trial court's refusal to instruct the jury on Preciado's alleged comparative bad faith, and to allow the jury to apportion fault to Preciado on the verdict form. The record does not reflect that the court actually ruled on Young America's request in this regard, other than to make a general ruling denying the parties' objections pertaining to specific jury instructions; however, motions that are not ruled on are deemed denied. *See State v. Hill*, 174 Ariz. 313, 323, 848 P.2d 1375, 1385 (1993) ("A motion that is not ruled on is deemed denied by operation of law."). We review a trial court's denial of a requested jury instruction or form of verdict for an abuse of discretion. *Ritchie v. Krasner*, 221 Ariz. 288, 299, ¶ 30, 211 P.3d 1272, 1283 (App. 2009).

¶28 In support of its request for a comparative bad faith instruction, Young America contended "there is evidence that Plaintiff intentionally delayed himself in providing certain documentation and ultimately refused to provide certain documents which he knew or should have known would have aided the claim being processed and resolved."[10]

¶29 The Uniform Contribution Among Tortfeasors Act ("UCATA") applies the principles of comparative fault in personal injury, property damage, and wrongful death actions. A.R.S. § 12-2506(A) (2016). Young America contends that although the statute "does not specifically refer to bad-faith [claims]," it reasons that bad faith is a tort, and therefore "the jury should have been given the opportunity to apportion fault to Preciado." Putting aside the fact that Young America "lost" the completed forms and other documents previously provided by Preciado, and that it had already internally acknowledged its acceptance of his total loss claim, Young America has cited no authority to support its proposition that UCATA mandates the application of comparative fault principles in bad faith cases, and we find none. Insurance bad faith is an intentional tort, *see Nardelli v. Metro. Grp. Prop. & Cas. Ins. Co.*, 230 Ariz. 592, 613, ¶ 106, 277 P.3d 789, 810 (App. 2012), and the principles of comparative fault do not apply to intentional torts. *See* A.R.S. § 12-2505(A) (2016) (stating "[t]here is no right to comparative negligence in favor of any claimant who has intentionally, willfully or wantonly caused or contributed to the injury"). The trial court therefore did not abuse its discretion in denying Young

---

[10] As reflected in its closing argument, Young America believed that after Preciado retained counsel, those lawyers "secretly" helped direct Preciado in manufacturing a bad faith claim to increase the likelihood of a significant settlement or verdict.

America's request to instruct or allow the jury to apportion fault to Preciado based on his alleged comparative bad faith.

###### III. Punitive Damages Award

**¶30**　　　　Young America argues the trial court erred in denying its motion for judgment as a matter of law on Preciado's punitive damages claim and that the jury's punitive damages award was both unconstitutional and unsupported by the evidence. We review *de novo* a trial court's ruling on a motion for judgment as a matter of law, and we view the evidence in the light most favorable to the nonmoving party. *Sobieski v. Am. Standard Ins. Co. of Wis.*, 240 Ariz. 531, 534, ¶ 8, 382 P.3d 89, 92 (App. 2016) (citation omitted).

**¶31**　　　　Proof of an insurer's liability for the tort of bad faith does not automatically entitle a plaintiff to punitive damages. *Rawlings*, 151 Ariz. at 161, 726 P.2d at 577 (rejecting the contention that, "since bad faith is a species of intentional tort, punitive damages are automatically recoverable in every case in which the plaintiff proves that the tort was committed"). To obtain punitive damages, a plaintiff must show by clear and convincing evidence that "the defendant's wrongful conduct was guided by evil motives." *Id.* at 162, 726 P.2d at 578; *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 332, 723 P.2d 675, 681 (1986). An evil motive may be found (1) where the defendant insurer "intended to injure the plaintiff" or (2) where, "although not intending to cause injury, [the] defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578 (citation omitted). In this second category, punitive damages may be warranted where the insurance company had and followed an established policy or practice that, in effect, placed its own financial interest over that of its insureds. *See Nardelli*, 230 Ariz. at 604-09, 277 P.3d at 801-06. But because punitive damages are restricted "to only the most egregious of wrongs," *Linthicum*, 150 Ariz. at 331, 723 P.2d at 680, such damages are recoverable in bad faith actions "when, *and only when*, the facts establish that the defendant's conduct was aggravated, outrageous, malicious or fraudulent." *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578 (citation omitted).

**¶32**　　　　Young America argues the evidence presented in this case was insufficient to warrant an award of punitive damages because although there may have been "missteps in the claims handling process," such evidence was not proof of "an evil mind." Our independent review of the evidence submitted at trial compels the conclusion that the evidence of these "missteps" was sufficient to justify the jury's finding of liability in the

bad faith action, but we agree with Young America that the trial court erred in denying its motion for judgment as a matter of law on Preciado's punitive damages claim.

¶33        At oral argument, Preciado agreed that his punitive damages claim is not premised on evidence of intentional harm. He does argue, however, that punitive damages are warranted in this case because Young America had and followed a policy of always offering "wholesale" price value for theft or total loss of insured property rather than "retail market value," which, in Preciado's view, violated Young America's contractual promise to pay "actual cash value" for an insured loss. Preciado further argues that this practice was intended to enhance Young America's financial position over that of its insureds. But the evidentiary proof—as opposed to counsel's argument—offered at trial falls short of the level of clear and convincing evidence that is required to allow a jury to consider the issue. *See Linthicum*, 150 Ariz. at 332, 723 P.2d at 681.

¶34        Preciado's argument is premised upon answers to deposition questions posed to Saldana, concerning the subject vehicle's NADA valuation, which was apparently the basis for Young America's settlement offer to Preciado.[11] During the deposition, Preciado's counsel attempted to get Saldana—who was not involved in the initial settlement offers to Preciado and had never seen the NADA report—to agree that the value assigned in the report was a "wholesale" value. Preciado was, in effect, arguing that "actual cash value" means "replacement value" in a "retail market" as reflected, for example, in the Kelley Blue Book. Saldana disagreed, pointing out that Preciado had insured the value of the vehicle, not its replacement cost. When pushed on the value most likely listed in the NADA report, Saldana replied that he did not have the report and could not say what was in it or the nature of the value assigned in the report. When further pushed on the issue, Saldana again stated that "we" (meaning Fred Loya) "pay the value of the vehicle. We don't pay retail." When

───────────────

[11]        During litigation, it was discovered that the NADA valuation report was not in the insurance claims file. Preciado argued that the report was intentionally removed from the insurance file and sent to a Young America lawyer, and notwithstanding formal discovery requests, it has never been produced. There is nothing in the record to indicate Preciado asked the court to intervene and compel the production of the report, or compel a satisfactory explanation as to why it could not be produced, or request an instruction to the jury concerning Young America's failure to produce the report.

pushed further, Saldana agreed that this meant Fred Loya's practice was to offer a wholesale value.

¶35    From this testimony, Preciado extrapolated and argued that Young America had a company-wide policy that, in theft or total loss property claims, the insured would never be offered retail replacement value, but would instead always be offered the wholesale value of the vehicle. Putting aside the fact that Saldana was not a Young America executive, claim manager, supervisor, or any other employee or representative who could speak knowledgeably about Young America's policies and practices,[12] this extrapolation was not even a fair representation of Saldana's testimony. Saldana testified, both in his deposition and at trial, that Fred Loya's claims adjusting practice for this type of coverage and loss was to pay the market value of the vehicle, considering its history, cosmetic appearance, and mechanical condition. Even if Fred Loya had a company-wide adjusting policy of "short-changing" its insureds by arbitrarily offering a wholesale value for these types of losses, there was no evidence produced that established that the named defendant in this case, Young America, had any similar policy or practice.[13]

¶36    At trial, the respective values the parties placed on the vehicle were substantially similar. Young America presented evidence explaining how it calculated the amounts of its various offers to Preciado. Although the jury ultimately did not agree with those explanations, that disagreement

---

[12]  In his testimony at trial, in response to questions about Saldana's knowledge concerning how Young America did or did not process the claim, Saldana indicated, "I don't know how Young America would work." Further, when asked by Preciado's counsel, "You can tell this jury, though, that Young America doesn't pay retail?", Saldana responded, "The Young America before we obtained it, I don't know what they paid."

[13]  When urged by Preciado's counsel to "tell this jury the truth about what Young America pays on total loss claims," Saldana answered, "We pay the actual cash value of the vehicle, considering the condition of the vehicle, the year, make and model. Take into consideration mileage on the vehicle. That's not going to match what you would see out on a car lot a lot [of] times because a car lot's prices are going to be bigger. So when [Preciado's counsel] asked me on retail, I was confused. But we pay the actual cash value. Whether you call that wholesale or not, that was the part that confused me."

does not establish that Young America acted with the requisite "evil mind" to support an award of punitive damages.

¶37        Preciado compares Young America's conduct in this case to the conduct of the insurer in *Hawkins v. Allstate Insurance Company*. There, the supreme court affirmed the jury's punitive damages award where Allstate had a "policy of routine, automatic deductions, regardless of their validity, in valuing an insured's loss." 152 Ariz. 490, 498, 733 P.2d 1073, 1081 (1987). But in *Hawkins*, three former Allstate employees testified in detail about the company's claims handling procedures. *Id.* at 494, 733 P.2d at 1077. One of the former employees stated that she was taught to "*always* deduct a $35 cleaning fee, regardless of the car's cleanliness." *Id.* at 495, 733 P.2d at 1078. She also testified that her supervisor explained the small deductions "wouldn't mean much to an insured or claimant, but $5 on every claim would mean a lot to the company." *Id.* (internal quotations omitted). Another former employee testified that he was told that, because the insureds were typically concerned with getting their vehicles back, they "would not perhaps object to some of these small deductions." *Id.* The same employee testified, "The statement was frequently made that if you could save one dollar on a million claims, you would save the company as much as a million dollars." *Id.* Thus, because "[t]he jury could have rationally concluded that Allstate's conduct . . . resulted in harm to countless insureds" and that Allstate "took advantage of its insureds' predicaments to settle claims at lesser amounts by deducting relatively small, innocuous amounts from each total loss claim under the guise of cost saving," the evidence was sufficient to support the punitive damage award. *Id.* at 502, 733 P.2d at 1085. But here, Preciado presented no testimony from any current or former Young America employees. Instead, he relied on a portion of the deposition testimony of a Fred Loya adjuster who, in context, appears to have been confused by Preciado's attorney's line of questioning. Saldana's deposition testimony alone is insufficient to constitute clear and convincing evidence of an "evil mind." *See Sobieski*, 240 Ariz. at 542, ¶ 43, 382 P.3d at 100 (concluding that "isolated phrases" are "wholly insufficient to constitute clear and convincing evidence required to support [a] claim for punitive damages"). Other than this arguably inconclusive testimony, which Saldana later clarified at trial,[14] Preciado presented no other evidence

---

[14]        Saldana testified at trial that Fred Loya "would not pay the retail price of a new vehicle," but the "actual cash value" of the vehicle being replaced. He also stated, "I don't know what you would define as wholesale. That's the part that confused me."

showing that Young America had a "routine policy" of arbitrarily paying the wholesale value on total loss claims.

¶38     We also note that, since *Hawkins*, this court has had occasion to analyze and apply the standard of proof necessary for punitive damages awards in bad faith actions. In 2012, we affirmed the entitlement to punitive damages where the plaintiffs presented evidence of the insurer's "aggressive company-wide profit goal" and the corporate policy behind that goal that was communicated to every associate, "emphasiz[ing] they should keep the $155 million target in mind when evaluating every aspect of every claim." *See Nardelli*, 230 Ariz. at 605-06, ¶¶ 62, 68, 277 P.3d at 802-03 (App. 2012). And more recently, in *Sobieski*, we reversed a jury's punitive damages verdict where the record "reveal[ed] nothing resembling the *Nardelli*-like profit-driven atmosphere." 240 Ariz. at 542, ¶ 43, 382 P.3d at 100. There, in comparing the facts to those in *Nardelli*, we concluded the *Sobieski* record lacked "any evidence that, as in *Nardelli*, company officers directed adjusters to reduce claims payouts to enhance the company's bottom line." *Id.* at 538, ¶ 17, 382 P.3d at 96. Further lacking in *Sobieski* was evidence of "compensation or evaluation policies that favored company profits over the interests of insureds." *Id.* at 542, ¶ 43, 382 P.3d at 100. Similarly, in this case, Preciado has presented no evidence that Young America directed claims adjusters to reduce claims payouts. *See Nardelli*, 230 Ariz. at 605-06, 277 P.3d at 802-03. And, as discussed above, Saldana's deposition testimony alone is insufficient to show that Young America had a corporate policy of denying their insureds the actual cash value of their property.[15] *See Hawkins*, 152 Ariz. at 498, 733 P.2d at 1081.

¶39     In addition to Preciado's claim that Young America had a "policy" of paying wholesale on total loss claims and that policy supported an award of punitive damages, Preciado also argues that Young America took other actions in this case that constitute clear and convincing evidence of an "evil mind." He contends that Young America's attempt to reduce its payment by the salvage value of the vehicle was an attempt to "minimize the payment" and to "put pressure on [Preciado]." He also asserts that Young America's placement of the phrase "full and final settlement" on the check sent to Preciado in 2013 was an attempt "to extract a release of all claims," and is evidence of "overt dishonesty." Additionally, he argues that Young America was "specifically aware" of Preciado's financial

---

[15]     Preciado's counsel conceded at oral argument that the DOI consent order did not indicate that Young America devalued total loss claims by paying "wholesale" values instead of "actual cash value."

vulnerability, and "played upon it while recklessly failing to process or pay the claim." Although we agree with Preciado that Young America's actions in this case show less-than-exemplary claims handling practices, on this record, we cannot conclude this constitutes clear and convincing evidence that Young America acted "with the intent to injure, or with conscious disregard of [Preciado's] rights and the injury that might result." *Thompson v. Better-Bilt Aluminum Prods. Co., Inc.*, 171 Ariz. 550, 557, 832 P.2d 203, 210 (1992).

**¶40** There is no doubt that the evidence produced at trial in this case was more than sufficient for the jury to find that the claims handling by Young America, and its treatment of Preciado, constituted a tortious breach of the covenant of good faith and fair dealing. But, for the reasons discussed above, that evidence falls short of the degree of proof required to support referral of the issue of punitive damages to the jury, and the court should have granted Young America's motion for judgment as a matter of law on that issue. *Cf. Rawlings*, 151 Ariz. at 162, 726 P.2d at 578 ("Indifference to facts or failure to investigate are sufficient to establish the tort of bad faith but may not rise to the level required by the punitive damage rule."). Accordingly, we reverse the trial court's denial of that motion and vacate the jury's award of punitive damages.[16]

> *IV.* *Consent Order*

**¶41** Young America contends the trial court abused its discretion in denying its motion *in limine* and permitting Preciado to introduce the DOI consent order as evidence at trial. In the presentation of his case to the jury, Preciado's counsel referred to the consent order during his opening and closing arguments and questioned a witness about his knowledge of it. Young America argues that Preciado's counsel used the consent order to "inflame" the jury to the point where it awarded significant punitive damages.

**¶42** We review a trial court's evidentiary rulings for an abuse of discretion, and will not reverse unless the court incorrectly applied the law or unfair prejudice resulted. *Larsen v. Decker*, 196 Ariz. 239, 241, ¶ 6, 995 P.2d 281, 283 (App. 2000). In reviewing the trial court's exercise of its discretion, "[t]he question is not whether the judges of this court would have made an original like ruling, but whether a judicial mind, in view of

---

[16] Because we vacate the punitive damages award, we need not address Young America's argument that the award violated constitutional principles.

the law and circumstances, could have made the ruling without exceeding the bounds of reason." *Associated Indem. Corp. v. Warner*, 143 Ariz. 567, 571, 694 P.2d 1181, 1185 (1985) (citation omitted). We review *de novo* the application and interpretation of procedural rules. *See Xavier R. v. Joseph R.*, 230 Ariz. 96, 98, ¶ 3, 280 P.3d 640, 642 (App. 2012) (citation and internal quotations omitted).

¶43        Young America asserts the trial court erred in denying its motion *in limine* to exclude the consent order because Preciado failed to comply with Rule 37(c). Rule 37(c)(1) provides that "[u]nless the court orders otherwise for good cause, a party who fails to timely disclose . . . a document . . . may not, unless such failure is harmless, use the . . . document as evidence at trial." Rule 37(c)(4) further provides that, where a party seeks to use a document "that it first disclosed later than the deadline set in a Scheduling Order, or—in the absence of such a deadline—60 days before trial," that party "*must* obtain leave of court by motion." (emphasis added). Additionally, "[t]he motion *must* be supported by affidavit and *must* show that: (A) the . . . document would be allowed under the standards of Rule 37(c)(1); and (B) the party disclosed the information, witness, or document as soon as practicable after its discovery." Ariz. R. Civ. P. 37(c)(4) (emphasis added).

¶44        In this case, the parties' joint scheduling order required the parties to "exchange[] up-to-date final Rule 26.1 Supplemental Disclosure Statements by 5:00 p.m. on August 29, 2014." In January 2015, the court set the case for trial to commence on May 4, 2015. On March 10, 2015, fifty-five days before trial, Preciado, through counsel, filed a fourth supplemental disclosure statement, in which he produced the consent order. As conceded at oral argument, Preciado did not request leave of the court by motion for the untimely disclosure of the consent order and did not submit an affidavit showing that the consent order "would be allowed under the standards of Rule 37(c)(1)" and that he had disclosed the consent order "as soon as practicable after its discovery." *See* Ariz. R. Civ. P. 37(c)(4).

¶45        Without question, Young America should have itself affirmatively disclosed/produced the subject consent order and, whether by intent or neglect, failed to do so. Preciado fortuitously obtained and disclosed the order, but failed to timely do so, or to comply with the rules of procedure in that regard. Although the issue was presented to the court by motion, it was raised by Young America's motion *in limine*, not by a Rule 37(c)(4) motion filed by Preciado. As noted by the trial court, Young America, as a signatory to the consent order, could hardly claim surprise or

other meaningful prejudice arising out of the use of the consent order at trial.

**¶46**      Were we allowed to simply apply equitable principles, we would, on this record, simply affirm the trial court's ruling; however, neither the parties nor this court should ignore the explicit dictates of Rule 37(c)(4). But, as noted above, Young America does not argue on appeal that the consent order played any role in the jury's assessment and award of bad faith compensatory damages; instead, it argues only that the admission and use of this document affected the punitive damages claim and award. With no briefing or argument that the use of the consent order affected the jury's award of compensatory damages on the bad faith claim, we affirm the court's order denying the motion *in limine*, notwithstanding the court's failure to follow the specific dictates of Rule 37(c)(4). *See* ARCAP 13(a)(7) (stating that, on appeal, an argument "must contain . . . Appellant's contentions concerning each issue presented for review, with supporting reasons for each contention, and with citations of legal authorities and appropriate references to the portions of the record on which the appellant relies"); *Polanco v. Indus. Comm'n*, 214 Ariz. 489, 491 n.2, ¶ 6, 154 P.3d 391, 393-94 n.2 (App. 2007) (stating that an appellant's failure to develop and support an argument waives that issue on appeal); *Nelson v. Rice*, 198 Ariz. 563, 567 n.3, ¶ 11, 12 P.3d 238, 242 n.3 (App. 2000) (stating that a party waives an argument by failing to raise it in the opening brief on appeal).

>       *V.      Breach of Contract Damages Award*

**¶47**      Young America asserts that the trial court erred in denying its motion for judgment as a matter of law on Preciado's breach of contract claim and that the jury's breach of contract award is unsupported by the evidence. We review *de novo* a trial court's ruling on a motion for judgment as a matter of law. *Felder v. Physiotherapy Assocs.*, 215 Ariz. 154, 162, ¶ 36, 158 P.3d 877, 885 (App. 2007). Judgment as a matter of law is proper "only if the facts presented in support of a claim have so little probative value that reasonable people could not find for the claimant." *Shoen v. Shoen*, 191 Ariz. 64, 65, 952 P.2d 302, 303 (App. 1997). In making that determination, "we view the evidence in a light most favorable to upholding the jury verdict and will affirm if any substantial evidence exists permitting reasonable persons to reach such a result." *Coll. Book Ctrs., Inc. v. Carefree Foothills Homeowners' Ass'n*, 225 Ariz. 533, 536, ¶ 9, 241 P.3d 897, 900 (App. 2010) (citation and internal quotations omitted).

**¶48**      Here, the record does not support Young America's claim that the trial court erred in denying its motion for judgment as a matter of law

on Preciado's breach of contract claim. Preciado presented evidence that his vehicle was insured by Young America, that the insurance policy required Young America to pay Preciado the "actual cash value" of the vehicle in the event of a theft, that a theft occurred, and that the offer and final payment made by Young America to resolve the claim was lower than the "actual cash value" of the vehicle. The evidence presented, although contested by Young America, was sufficient for a reasonable juror to have found that Young America breached its contract with Preciado by failing to abide by the terms of the insurance policy, and therefore was liable for direct and consequential damages arising out that breach.

¶49　　　　Nonetheless, we conclude that the amount of the jury's award for breach of contract was against the weight of the evidence provided at trial. *See Styles v. Ceranski*, 185 Ariz. 448, 450, 916 P.2d 1164, 1166 (App. 1996) (stating that this court must set aside a verdict "if there is no evidence in the record to justify it"). The jury's $34,500 breach of contract award is considerably more than the difference between what Preciado requested for the truck, $14,435.69,[17] and what Young America ultimately gave him, $11,597.17. The difference amounts to $2,838.52. Young America contends that, after subtracting the difference from the $34,500 award, the remaining $31,661.48 "was presumably for 'loss-of-use' damages," and that, notwithstanding the court's instruction on consequential damages, Preciado neither claimed those damages in his complaint nor disclosed the required computation for the measure of those damages, as required by Rule 26.1.[18]

¶50　　　　Despite Preciado's argument to the contrary, he failed to plead loss-of-use consequential damages for breach of contract in his complaint.[19] Although certain issues, including consequential damages,

--------

[17]　　　　Preciado requested $13,800 for the vehicle, plus $1,121.94 in tax and $13.75 for the truck's registration tags, minus the $500 deductible.

[18]　　　　Preciado argues Young America waived this argument by not raising it below. We conclude, however, that Young America preserved the issue on appeal by objecting to the proposed jury instruction on consequential damages for loss of use.

[19]　　　　Preciado cites a "catch-all" damages paragraph in his complaint corresponding to his bad faith claim as support for his argument that he claimed consequential damages for his breach of contract claim. However, that language merely references "other consequential damages," without providing any specifics.

that are not raised in the pleadings may be tried in certain circumstances, *see Home Indem. Co. v. Bush*, 20 Ariz. App. 355, 359, 513 P.2d 145, 149 (App. 1973), Rule 26.1(a)(7) nevertheless requires a party to disclose "a computation and measure of each category of damages alleged." In this case, we find no evidence in the record that Preciado disclosed a computation and measure concerning the loss of use of his vehicle for approximately four years, or of any other consequential damages pertaining to his breach of contract claim, as required by Rule 26.1(a)(7), nor does Preciado's answering brief respond to Young America's argument in this regard.[20]

**¶51** Finally, in addition to the pleading and disclosure defects, we note the evidence at trial does not support the contract damages. Accordingly, we vacate the jury's $34,500 breach of contract award and remand this issue to the trial court to enter a modified verdict for breach of contract in the amount of $2,838.52 plus interest to reflect the contractual damages supported by the evidence.

### VI. Trial Court's Award of Attorneys' Fees and Costs

**¶52** Young America contends the trial court abused its discretion in its award of attorneys' fees. Under A.R.S. § 12-341.01(A) (2016), a court may award reasonable attorneys' fees to the successful party in a contested action arising out of contract. Here, Preciado requested the trial court award forty-five percent of the total recovery, for a total of $401,730.06 in fees. Instead, the trial court awarded $302,170 in fees.

**¶53** Although A.R.S. § 12-341.01(A) provides that a court may award attorneys' fees to the prevailing party in a breach of contract action, the statute does not expressly provide for an award of fees specifically incurred relative to a bad faith tort claim. *See* A.R.S. § 12-341.01(A) ("In any contested action *arising out of a contract, express or implied*, the court may award the successful party reasonable attorney fees.") (emphasis added). *See also Smith v. Am. Exp. Travel Related Servs. Co.*, 179 Ariz. 131, 141, 876 P.2d 1166, 1176 (App. 1994) (concluding the trial court erred in awarding attorneys' fees pursuant to A.R.S. § 12-341.01 for claims that were "solely

---

[20] In closing argument, Preciado's counsel suggested a methodology for the jury to consider in calculating a loss-of-use component to a compensatory damages award. Counsel's argument is not a substitute for evidence or proof sufficient to sustain such an award. *See Quine v. Godwin*, 132 Ariz. 409, 412, 646 P.2d 294, 297 (App. 1982).

tort claims"). *But cf. Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 544, 647 P.2d 1127, 1142 (1982) (stating that because "the tort of bad faith cannot be committed absent the existence of an insurance contract and a breach thereof," the tort of bad faith is "intrinsically related to the contract," such that attorneys' fees may be awarded under A.R.S. § 12-341.01).

¶54        Here, because Preciado was the prevailing party in a breach of contract action, the trial court had discretion to award him reasonable attorneys' fees. Because the fee award does not allocate separate amounts for each of Preciado's claims,[21] we conclude that implicit in the trial court's fee award was the determination that Preciado's bad faith claim was "intrinsically related" to his breach of contract claim. Accordingly, as the prevailing party on a breach of contract claim and an "intrinsically related" bad faith tort claim, Preciado is entitled to reasonable attorneys' fees, and the trial court's fee award was not an abuse of discretion.

¶55        Young America also objects to the trial court's award of taxable costs to Preciado in the amount of $4,477.91. We review a trial court's award of costs for an abuse of discretion, *Maleki v. Desert Palms Prof'l Props., L.L.C.*, 222 Ariz. 327, 333-34, ¶ 32, 214 P.3d 415, 421-22 (App. 2009), but the issue of whether a particular expenditure qualifies as a taxable cost is a question of law that we review *de novo. Foster v. Weir*, 212 Ariz. 193, 195, ¶ 5, 129 P.3d 482, 484 (App. 2006).

¶56        Pursuant to A.R.S. § 12-332(A) (2016), taxable costs in the superior court include the cost of taking depositions. Young America argues Preciado is not entitled to the costs incurred for both of his attorneys to travel from Arizona to Texas to take the deposition of Arturo Saldana. Because "[t]ravel costs related to the taking of depositions outside Arizona . . . have been determined to be taxable costs," *Bennett v. Baxter Group, Inc.*, 223 Ariz. 414, 423, ¶ 37, 224 P.3d 230, 239 (App. 2010), and it was not unreasonable for both of Preciado's attorneys to be present for the deposition of a key witness, the trial court did not abuse its discretion in awarding the challenged travel expenses.

---

[21]        The court did not specify how it calculated the amount awarded; however, the number is consistent with the lodestar figure claimed in Preciado's application for fees. *See Charles I. Friedman, P.C. v. Microsoft Corp.*, 213 Ariz. 344, 347 n.2, ¶ 1, 141 P.3d 824, 827 n.2 (App. 2006) (stating that "[a] lodestar figure is 'the product of reasonable hours times a reasonable rate.'") (citation omitted).

**¶57**        A.R.S. § 12-332(A) also provides that taxable costs include witness fees.  Young America claims that Preciado should not have been awarded costs for the defense expert's witness fee because such fees generally "do not extend to fees paid for an expert witness to appear at trial."  However, the witness fee Preciado requested as a taxable cost was not related to the expert's testimony at trial, but rather the fee Preciado incurred in taking the deposition of the expert.  Because taxable costs include those incurred where a party "is required to pay an *opponent's* witness an expert fee or incurs other expenses necessarily and reasonably incurred to obtain an *adverse witness's* testimony before trial," *Rabe v. Cut & Curl of Plaza 75, Inc.*, 148 Ariz. 552, 555, 715 P.2d 1240, 1243 (App. 1986), the trial court did not abuse its discretion in awarding Preciado the defense expert witness fee as a taxable cost.

**¶58**        Finally, Young America challenges the trial court's award of $108 for the cost incurred in obtaining the transcript of a status conference.  Although A.R.S. § 12-332(A) provides that taxable costs in the superior court include the cost of "certified copies of papers or records," this court has held that the cost of the transcript of a hearing is not a recoverable expense.  *See Cyprus Bagdad Copper Corp. v. Ariz. Dep't of Revenue*, 188 Ariz. 345, 347, 935 P.2d 923, 925 (App. 1997).  Therefore, the trial court abused its discretion in awarding Preciado the cost associated with obtaining the hearing transcript.  Accordingly, we vacate the trial court's award of $4,477.91 in taxable costs, and remand for a modified award of costs in the amount of $4,369.91.

> *VII.    Attorneys' Fees and Costs on Appeal*

**¶59**        Both parties request attorneys' fees on appeal pursuant to A.R.S. § 12-341.01.  In the exercise of our discretion, we deny both requests.  As the substantially prevailing party on appeal, Young America is entitled to its taxable costs on appeal upon compliance with ARCAP 21.

## CONCLUSION

**¶60**        We affirm the trial court's ruling interpreting the meaning of "actual cash value" as it pertains to this case.  We affirm the trial court's ruling denying Young America's request to instruct the jury on Preciado's alleged comparative bad faith and the trial court's ruling on the consent order.

**¶61**        We reverse the trial court's denial of Young America's motion for judgment as a matter of law on Preciado's punitive damages claim and vacate the jury's award of punitive damages.  We also vacate the jury's

breach of contract award and remand for the entry of a modified award in the amount of $2,838.52 plus interest. We affirm the jury's award pertaining to Preciado's bad faith claim.

**¶62** Finally, we affirm the trial court's award of attorneys' fees, but vacate the award of costs and remand for the entry of a modified award in the amount of $4,369.91.



AMY M. WOOD • Clerk of the Court
FILED: AA